[Civil No. 1492.   Filed May 12, 1916.]

[157 Pac. 371.]

A. E. DEYO, Appellant, v. ARIZONA GRADING AND CONSTRUCTION COMPANY, a Corporation, Appellee.

1. MASTER AND SERVANT—EMPLOYERS' LIABILITY ACT—SUPERINTENDENTS—"WORKMAN"—"EMPLOYEE."—In view of Constitution, article 18, section 7, directing the legislature to enact laws "to protect the safety of employees in all hazardous occupations," a superintendent of a construction company injured by a delayed blast, while in such employment, is entitled to recover for such injuries under the employers' liability law (Civ. Code 1913, §§ 3153–3162), as the words "workman" and "employee" are used therein interchangeably and with the same meaning, and a superintendent is included in the term "employee."

2. STATUTES—CONSTRUCTION—WORDS.—Any unhappy or careless use of words, especially when expressive of cognate ideas, should not be construed so as to defeat the avowed intention of the law-making body.

3. STATUTES—CONSTRUCTION—LEGISLATIVE INTENT.—The first rule of interpretation and construction of statutes is that the intention of the legislature, when determinable, shall control.

[As to construction of statutes so as not to recognize *casus omissus*, see note in Ann. Cas. 1913D, 711.]

APPEAL from a judgment of the Superior Court of the County of Pima. Wm. F. Cooper, Judge. Reversed and remanded for new trial.

Mr. Frank E. Curley, for Appellant.

Messrs. Armstrong & Lewis and Mr. W. J. Bryan, Jr., for Appellee.

ROSS, C. J.—This is an action for damages for personal injury under the employers' liability law. Appellant was employed by the appellee in the month of February, 1914. The latter part of March, under his supervision and direction, the appellee began the construction of a tunnel for the La Cienga Land & Cattle Company in Pima county. At the

same time appellee was running the tunnel it was doing some construction work in the city of Tucson. Appellant had charge of the work at both places.

On the 10th of May he went from Tucson to the tunnel site, arriving about 12 o'clock, and, finding three holes drilled, he loaded them and primed them; he then lighted the fuses, but only two of them exploded; after waiting about an hour and a half he went back to the tunnel to see what had happened to the missed shot, and just as he reached the face of the tunnel it exploded, from which he received the injuries complained of. Quoting his own language, he testified:

"I did work. Whatever there was to be done. Any kind of work that came up. Shooting or handling a drill, and whatever kind of work they needed done at the time. I was in charge of other men there. I was superintending the job. . . . I loaded these holes and primed them. I loaded the holes myself. I had assistance; the man who got the powder for me. I had been in the habit of doing this work there off and on. Off and on I had been doing the work before."

On April 3, 1914, the appellee created, by a resolution, the office of superintendent with authority to purchase such matters and things as in the ordinary course of the business of the company were needed by it for such work as it had in hand, with the provision that if such matters or things should cost exceeding $150, it should be submitted to the board of directors for their approval and ordered through the president of the corporation. It was further provided in said resolution that the superintendent should have full charge of the actual operations being carried on by the company and those engaged in the work, and that the checks of the company given for necessary disbursements should be signed by the superintendent and auditor. The compensation of the superintendent was fixed at $200 per month. Appellant testified that his duties were the same before the passage of this resolution as afterward, but that his salary theretofore had been $150 per month. It is shown that he employed and discharged the men working on the job under him and directed them in their work.

The case was tried to a jury and after the appellant had rested his case, upon motion of appellee, the jury was instructed by the court to return a verdict for the appellee.

This motion was granted, as we understand it, "upon the ground that the plaintiff had failed to establish his status as a workman, but had shown himself to have been the general superintendent and manager of the defendant corporation, and that the accident was not shown to have arisen out of or in the course of the labor, services or employment for which he was engaged by the defendant company." The appeal is prosecuted from the order directing a verdict and from the judgment.

The specification of error involves the correctness of the direction to the jury upon the close of appellant's case. In other words, under the employers' liability law, constitutional and statutory, is a person employed in hazardous occupations, as superintendent, entitled to recover for injuries received while in such employment, or are the provisions of the law for the benefit only of subordinate or inferior employees in such employment?

The provision of the Constitution immediately bearing upon the question (section 7, article 18) is as follows:

"To protect the safety of employees in all hazardous occupations, in mining, smelting, manufacturing, railroad or street railway transportation, or any other industry the legislature shall enact an employers' liability law, by the terms of which any employer, whether individual, association, or corporation shall be liable for the death or injury, caused by any accident due to a condition or conditions of such occupation, of any employee in the service of such employer in such hazardous occupation, in all cases in which such death or injury of such employee shall not have been caused by the negligence of the employee killed or injured."

It will be observed that this section of the Constitution makes use of the words "employer and employee" as descriptive of those intended to be affected. It is also declaratory of a new principle with an injunction to the law-making body to provide a procedure for the enforcement of the rights and liabilities growing out of the relation of the employer and employee, as therein enunciated. This provision of the Constitution differs from section 8, article 18, which provides for the institution of a workmen's compulsory compensation law, and uses the correlative words "employer and workman" as descriptive of the relation intended to be affected. The

legislature, in carrying out the mandates contained in these two provisions of the Constitution, failed to discriminate as the Constitution makers had, and loosely, if not carelessly, used the words "employee and workman" interchangeably.

The workmen's compensation law is limited and applicable to "workmen engaged in manual or mechanical labor in such employments as the legislature may determine to be especially dangerous" by the very terms of the Constitution. Without trying to determine what grades or classes of workmen this was intended to cover, it is evident that it did not intend to reach other than those "engaged in manual or mechanical labor." There is no such limitation in the constitutional provision providing for the employer's liability and the employee's rights thereunder.

What the legislature did to make effective the employer's liability provision of the Constitution is contained in chapter 6, title 14, Civil Code of 1913. As originally passed, the title of this chapter was "to provide for employers' liability for injuries to workmen in especially dangerous occupations." Sections 3153, 3154 and 3155, being the first three sections, are as follows:

"3153. This chapter is and shall be declared to be an employers' liability law as prescribed in section 7 of article XVIII of the state Constitution.

"3154. That to protect the safety of employees in all hazardous occupations in mining, smelting, manufacturing, railroad, or street railway transportation, or any other industry, as provided in said section 7 of article XVIII of the state Constitution, any employer, whether individual, association, or corporation, shall be liable for the death or injury, caused by any accident due to a condition or conditions of such occupation, of any employee in the service of such employer in such hazardous occupation, in all cases in which such death or injury of such employee shall not have been caused by the negligence of the employee killed or injured.

"3155. The labor and services of workmen at manual and mechanical labor, in the employment of any person, firm, association, company, or corporation, in the occupations enumerated in the next section hereof, are hereby declared and determined to be service in a hazardous occupation within the meaning of the terms of the preceding section. By reason

of the nature and conditions of, and the means used and provided for doing the work in, said occupations, such service is especially dangerous and hazardous to the workmen therein, because of risks and hazards which are inherent in such occupations and which are unavoidable by the workmen therein.''

It will thus be seen that the words ''workman and employee'' have been indiscriminately used by the lawmakers in describing the status of those rendering service to an employer. It is the contention of appellee that the word ''workman'' was advisedly and purposely used, and that it should be given the limited meaning ordinarily understood. We think that the declaration of the legislature of its intention to pass a law under the provisions of section 7, article 18, of the Constitution should be the key to the door of what follows. It would be unfair and unreasonable to hold that a co-ordinate branch of the government, in the face of a declared purpose, would proceed intentionally to do something else.

Any unhappy or careless use of words, especially when expressive of cognate ideas, should not be construed so as to defeat the avowed intention of the law-making body. That the legislature should have used the word ''employee,'' where the word ''workman'' has been used, is without question. It is equally as clear, we think, that the word ''workman,'' when used, was intended to be as comprehensive as the word ''employee'' and was substituted for it, not for a change of meaning in the text, but as expressive of the same idea.

Section 7, article 18, of the Constitution, provided that employers of certain hazardous enterprises should be liable in damages to any employee injured while in the service, and directed that the legislature should enact an employers' liability law. The avowed purpose of chapter 6, *supra,* was to carry out that mandate. The first rule of interpretation and construction of statutes is that the intention of the legislature, when determinable, shall control. This rule is very well stated in the following cases:

''In the interpretation of statutes, the great principle which is to control is the intention of the legislature in passing the same, which intention is to be ascertained from the cause or necessity of making the statute as well as other cir-

cumstances. A strict and literal interpretation is not always to be adhered to, and where the case is brought within the intention of the makers of the statute, it is within the statute, although by a technical interpretation it is not within its letter. It is the spirit [the object] and purpose of a statute which are to be regarded in its interpretation, and if they find fair expression in the statute, it should be so construed as to carry out the legislative intent, even though such construction is contrary to the literal meaning of some provisions of the statute." *People* v. *Lacombe*, 99 N. Y. 43, 1 N. E. 599.

"In the construction of statutes, it is a cardinal rule that the intention of the legislature must govern. Suth. St. Const., par. 218; Sedg. St. & Const. Law, p. 325. Also, that when the intention can be gathered from the statute, words may be modified, altered or supplied to give to the enactment the force and effect which the legislature intended." *Territory* v. *Clark*, 2 Okl. 82, 35 Pac. 882.

"Statutes must have a rational interpretation, to be collected not only from the words used, but from the policy which may be reasonably supposed to have dictated the enactment." *Anderson Driving Park Assn.* v. *Thompson*, 18 Ind. App. 458, 48 N. E. 259.

Taking this rule as a guide, we must hold that wherever the word "workman" is used in chapter 6, *supra*, it was intended to have the meaning of the word "employee" as used in section 7, article 18, of the Constitution. Such a construction is not only reasonable, but necessary. It gives the statute a meaning in harmony with the constitutional provision. It is within the reason of the law and accomplishes its purpose.

Omitting some words, but retaining its meaning, the constitutional provision is in effect that the legislature should enact a law for the protection of the safety of employees, by the terms of which any employer should be liable for the death or injury of any employee in the service of such employer in hazardous occupations in all cases in which such death or injury was not caused by the negligence of the employee killed or injured. This was a command or mandate to the legislature to do a certain thing. The legislature, by section 3154, *supra*, obeyed this direction both in letter and

spirit by declaring the employer's liability for injury or death of an employee in hazardous occupations when not occasioned by the negligence of the employee. The grade or station of the employee or the kind of work being performed by him, neither by the Constitution nor section 3154, was of any consideration; the important thing being that the employee was "in the service of such employer" in some hazardous occupation at the time of the injury or death. However, section 3155, *supra,* undertakes to limit the protection of the constitutional provision to "the labor and services of workmen at manual and mechanical labor" in the occupations enumerated in section 3156 which are defined as especially dangerous and hazardous.

Whether the legislature exceeded its authority and power in restricting the beneficiaries of the law to those engaged in manual and mechanical labor only, we do not deem it necessary to determine under the facts of this case. That question was not presented in argument by counsel, but it appears to be within the reason of the rule laid down by this court in *Behringer* v. *Inspiration Consolidated Copper Co.,* 17 Ariz. 232, 149 Pac. 1065, in which we held that the legislature did not possess the power to enlarge the mandate of the Constitution as to the workmen's compulsory compensation law. If it may not enlarge the mandate so as to bring within its provisions persons not mentioned by the Constitution, it would seem, upon reason, that the legislature is without power to exclude from the benefits of the constitutional provision persons therein designated as beneficiaries, and confer the right of action only on those engaged in manual and mechanical labor.

The appellee contends that the appellant was not an employee of its within the meaning of the law; that it was never intended that the word "employee" should be construed to mean a superintendent, but that it was intended to mean a person in the service of an employer in a grade subordinate to that of superintendent or manager. The New Standard Dictionary defines employee as:

"A person who is employed; one who works for wages or a salary; one who is engaged in the service of or is employed by another."

Webster defines employee:

"One employed by another; a workman in the service of another; usually distinguished from official or officer or one employed in a position of some authority."

Labatt, section 1949, says:

"In its most extended signification this term [employee] is applicable to any person employed by another."

The word "employee" has frequently been defined by the courts in construing the statutes giving liens to employees and wage-earners and statutes giving preference to such creditors, against other creditors, of insolvents. The word usually, however, in such cases is associated with other descriptive words. *Matter of Stryker,* 158 N. Y. 526, 70 Am. St. Rep. 489, 53 N. E. 525, was a case in which the court had under consideration a statute which gave preference to "the wages of the employees, operatives and laborers" of corporations in the hands of a receiver. The court there said:

"When two or more words of analogous meaning are employed together, they are understood to be used in their cognate sense, to express the same relations and give color and expression to each other. Hence, although the word employee is general and comprehensive, it must be limited by the more specific words, operatives and laborers, which are found in the statute."

The New Jersey preference law defines those entitled to preference as all "persons doing labor or service of whatever character for, or as workmen or employees in, the regular employ of such corporation."

Labatt, at section 1948, says:

"It has been held, with reference to these descriptive words, that neither a president nor a director is entitled to a preference in respect to remuneration due for services rendered in any of those capacities, but that the provision is applicable to the salary of a manager, although he also discharges the functions of a president, and to the salary of a bookkeeper, although he is also a director. It has also been intimated that the secretary and treasurer of a company, if they are not directors, are entitled to a preference."

The word "employee" as used in our Constitution and statute, stands alone, unassociated with any other words descriptive of the employed. "Any employee in the service of such employer" is declared a beneficiary of the law. The

language used is comprehensive enough to include any and every person in the service of the employer from the president to a hod carrier. There are good reasons, however, for not giving the word "employee" such a broad and comprehensive meaning in lien and preference laws, and those reasons are very well expressed in *England* v. *Beatty Organ & Piano Co.,* 41 N. J. Eq. 470, 4 Atl. 307, wherein it is said:

"The president of a corporation, under the act, is and must be a director. He is part and parcel of the organization. There must be employer as well as employed; and the question arises: Does the act authorize the organization, which is the employer, to employ itself? . . . I am well satisfied that to make favorites of this class would be against the true spirit of the act as well as against a wise policy. The spirit of the act is manifestly to pay 'laborers doing labor or service' . . . and not to give a preference to the individual members of the corporation; and not that they may employ themselves and maintain both attitudes, employer or employee, as their individual gain and the loss of creditors may dictate. And as to the public policy of so extending the construction as is urged, let it be considered how strong the inducement as well as how convenient for every director to be employed 'doing labor or service as a workman or employee' for his company; and let it also be considered what a prolific source of injustice and fraud such construction would prove to be. There are numerous considerations in this direction which will arise to the mind of the thoughtful."

These definitions of "employee," to which we have referred, and in all cases where the courts have had occasion to define it, have been more or less influenced by the context in which the word was used. It is frequently and indeed "usually distinguished from official or officer or one employed in a position of some authority," but the reason of that lies in the fact of its association with other qualifying words and because of a manifest intention upon the part of the legislature to so use it. It is not necessary to determine or decide that it was used in its most comprehensive sense in the Constitution and statute for the purposes of this case. It may be that in a proper case its meaning should not be ex-

tended so as to include officers of a corporation who are the corporation itself, or a part thereof. However, the reasons assigned under the preference and lien laws for not giving it its most comprehensive signification can hardly be said to apply to the employers' liability law. While in those cases the officers could and might be disposed to vote themselves large salaries and, if preferred or allowed, thus consume the assets of the company, it is extremely improbable that any officer would intentionally occasion his own death or injury in order to become a beneficiary under the employers' liability law.

All business enterprises have certain overhead and maintenance charges, and the modern idea is to include in these any damages suffered by those carrying on and conducting a business. In all of the especially dangerous and hazardous occupations enumerated in the statute when prosecuted on a large scale, it is as essential to have superintendents as it is to have workmen, and no good reason appears to us why a business or enterprise or occupation should be charged with damages sustained by workmen and not be charged with damages sustained by the superintendent, if he should be injured in the service without negligence upon his part. We are therefore of the opinion that the appellant is not only within the letter, but within the spirit, of the law, and that the court erred in directing a verdict for the appellee.

Judgment is reversed and cause remanded for new trial.

FRANKLIN, J., concurs.

CUNNINGHAM, J. (Concurring Generally).—I concur in the reasons given by the Chief Justice for the decision and such reasons, with the additional reasons set forth below, considered, I concur in the decision and order reversing and remanding the cause for a new trial. The reasons I have to advance concern that part of the contention as follows:

"That the plaintiff had failed to establish . . . that the accident was not shown to have arisen out of or in the course of the labor, services or employment for which he was engaged by the defendant company."

The grounds for directing the verdict, which have been fully considered in the opinion of the Chief Justice, precede those I propose discussing. The decision reached by the

Chief Justice necessarily includes a consideration of the grounds I propose to further discuss, but I propose giving reasons for my decision of the questions presented, in addition to those already stated.

The "Employers' Liability Act," chapter 6, title 14, Civil Code of Arizona of 1913, paragraph 3156, declares certain designated occupations as hazardous within the meaning of the chapter.    Subdivision (2) designates that "all work when making, using or necessitating dangerous proximity to gunpowder, blasting powder, dynamite, compressed air, or any other explosive," and subdivision (9) designates that "all work in the construction and repair of tunnels, subways and viaducts," are of hazardous occupations.

The parties concede that the occupation in which the defendant company was engaged at the time the alleged accident occurred was that of the construction of a tunnel, and by the use of dynamite or blasting powder, therefore the alleged accident is one in an occupation declared to be hazardous within the meaning of the Employers' Liability Act, paragraph 3155.

Paragraph 3157 requires employers of workmen in such hazardous occupations to adopt rules, regulations and instructions for the information of their employees in such occupations, as to the duties of their employment, "to the end of protecting the safety of employees in such employment."

Paragraph 3158 provides:

"When in the course of work in any of the employments or occupations enumerated in the preceding section, personal injury or death by any accident arising out of and in the course of such labor, service and employment, and due to a condition or conditions of such occupation or employment, is caused to or suffered by any workman engaged therein, in all cases in which such injury or death of such employee shall not have been caused by the negligence of the employee killed or injured, then the employer of such employee shall be liable in damages to the employee injured," etc.

Hence in order for the liability to arise under this chapter the injured person must have been employed by the defendant to perform work in some of the employments or occupations enumerated as hazardous, and the accident must have been due to a condition of the employment, which is con-

ceded, and at the time of the accident from which the injury arose he was occupied in the performance of some duty for which he was employed, and the accident inflicting the injury arose out of and in the course of such labor, service, or employment.

The right to recover is only limited "to the employee injured." Paragraph 3158.

In the case of *In re Employers' Liability Assur. Corp.* (*McNicol's Case*), 215 Mass. 497, L. R. A. 1916A, 306, 102 N. E. 697, the Massachusetts court had before it the meaning of the words, "arising out of and in the course of his employment," as those words are used in the Workmen's Compensation Act. Those words are used in our statute, *supra*, with reference to the employer's liability, but with no different meaning from that in which they were used in the statute under consideration by the Massachusetts court. The scope of the phrases as they are used both in the Massachusetts and the Arizona statute seems to be the same.

The court said: "In order that compensation may be due the injury must both arise out of and also be received in the course of the employment. Neither alone is enough. . . . It is sufficient to say that an injury is received 'in the course of' the employment when it comes while the workman is doing the duty which he is employed to perform. It 'arises out of' the employment, when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work, and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workmen would have been equally exposed apart from the employment. The causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it

must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence."

In *Bryant* v. *Fissell,* 84 N. J. L. 72, 86 Atl. 458, it was said:

"To warrant a recovery, it must appear that Bryant's [the employee's] death was caused by (a) an accident (b) arising out of, and (c) in the course of, his employment. Even though the injury arose out of and in the course of the employment, if it be not an 'accident,' within the purview of the act, there can be no recovery. Even if there be an accident which occurred 'in the course of' the employment, if it did not arise 'out of the employment,' there can be no recovery; and even though there be an accident which arose 'out of the employment,' if it did not arise 'in the course of the employment,' there can be no recovery."

In *Bryant* v. *Fissell, supra,* the court said:

"The burden of furnishing evidence from which the inference can be legitimately drawn that the death of an employee was caused by 'an accident arising out of and in the course of his employment' rests upon the claimant.

See, also, *Plumb* v. *Cobden Flour Mills Co.,* Ann. Cas. 1914B, 495, and cases cited in note thereto.

If the law is as declared by these authorities, as applicable to the Employees' Compensation Act, when it is employed in connection with substantially the same context, I am of the opinion that the same rules of law are equally applicable to our Employers' Liability Act using the identical phrases there considered. Such being the meaning and scope of the phrases, the fact that the accident was due to a condition of the employment conceded, we are only concerned with the question whether the plaintiff has by his evidence sustained the burden of proof from which the inference can be legitimately drawn that the injury here complained of was caused by an accident arising out of and in the course of the employment; that is, in the course of the performance by plaintiff of a duty required of him by his employer.

No question is raised whether plaintiff was employed by defendant in some capacity, and that he was occupied in defendant's service at the time he received the injuries. In his

XVIII Ariz.—11

testimony he describes the conditions surrounding, and the accident, as follows:

"On May 10th, the day this accident occurred, I left Tucson in the morning and went out to Vail, and when I got to camp the night shift had gone off duty and had left some holes to be shot. I arrived at camp about 12 o'clock I think. I loaded these holes and primed them. I loaded the holes myself. . . . I had been in the habit of doing this work there off and on. . . . I loaded the holes, and lighted the fuses. There were three holes charged. They were lower bench holes, the three of them, and about four feet in depth, and we shot the middle one first, and then shot the outside ones to break in toward the center hole. We loaded that center hole a little heavier than the outside holes and cut the fuse shorter so that it goes off first, and then the outer holes broke into the opening that this inside hole has broken in. That is the ordinary way of loading these holes and firing them. . . . I loaded the middle hole as the fuse was about three or four inches shorter than the outside fuse, and I held the fuses all together and lighted them at the same time, and saw that all three were lit. That is the ordinary way of blasting. The way ordinarily pursued in that class of work so far as I know. After lighting the fuses, we retired up the creek probably 400 or 500 feet to await the explosion. I timed the fuses at the time I lit them. They should have exploded within four or five minutes. Two of them exploded within five minutes and the other did not explode. After the first two holes exploded I waited for some little time, probably ten minutes. My brother, the man that drilled the holes, and the engineer were with me. . . . After waiting ten minutes, I walked back to the face of the tunnel. The tunnel was full of gas, and one of the boys started in, but it was so full of gas that he came back out. We then looked around a while, and we went over and I told the boys we would go over and have dinner, and after dinner we would work in the other end of the tunnel. We had dinner at the camp, which is about 600 or 700 feet from the tunnel. We waited practically, I should imagine, half an hour before dinner was ready. . . . After dinner we went back there and I put the other boys to work—got the engine or compressor started, and put the boys to work in the other end of the tunnel. I

loafed around a while to see what was going on and intended
to go home, but it struck me that in case the night shift came
on, they might drill into that hole and have a serious explo-
sion. So I thought that after being so long that I had better
go back and see what had happened to it. . . . I went back
into the tunnel; the tunnel was clear, and I had just reached
the face of the tunnel when the explosion occurred. That, I
think, was about an hour and a half after I had lighted it.
When I got into the tunnel there was nothing to indicate that
there was still fire in the hole. . . . I went into the face of
the tunnel to see why the hole hadn't gone off and see if the
fuse had gone out, or what had happened, to keep it from
having an explosion when the boys drilled in to it on the night
shift. . . . ''

On cross-examination he stated:

''No one directed me to go into the tunnel. I went in there
of my own accord and as superintendent of the company
to ascertain what was the matter. No officer or agent of the
company gave me any instructions as to going into the
tunnel.''

This is all the evidence as it relates to the occupation of
plaintiff at the time the accident occurred. His purpose for
going into the tunnel is clearly stated as one to protect the
night shift from injury in case they might drill into the mis-
fired hole and cause an explosion. Was this act one in the
course of the superintendent's employment? Was the pro-
tection of the workmen, in furnishing them a safe place to
work, within the scope of the superintendent's duties? Cer-
tainly it was the duty of the employer to furnish the work-
men a safe place to work, and such duty must have been dele-
gated to a superintendent given complete charge of the work
and made his duty to see that such safety was provided.

This was a question for the jury to determine from the
evidence, and I am of the opinion that the evidence given
should have been submitted to the jury, and if deemed satis-
factory as establishing the fact that the purpose of the
superintendent in going into the tunnel was to care for the
safety of the workmen under his charge, he was performing
his duty as an employee and entitled to recover as such under
paragraph 3158, *supra.*

Such verdict on such evidence must necessarily be sustained on appeal as one supported by substantial evidence. As superintendent in charge of the work of defendant, what more important service could he render his employer "to the end of protecting the safety of employees in such employment." Paragraph 3157, Civil Code of Arizona 1913. And whether he went into the tunnel in the circumstances set forth in his testimony, as a mere volunteer, or in obedience to express rules, regulations, or instructions, promulgated by the employer, or as one employee promoting the best interests of his employer to fulfill a duty impliedly resting upon him by virtue of his employment, is the question for determination by the jury's verdict in every such case. If he entered the tunnel as a mere volunteer, no matter how noble the purpose prompting, he was not acting in the course of his employment, and cannot recover. If he entered the tunnel because his employment expressly or impliedly called upon him to do so, he was acting within the scope of his duty, and the act was in the course of his employment, and he was entitled to recover.

I am therefore of the opinion that the court erred in directing the verdict, and the judgment should be reversed because of the erroneous instruction.

----

As to constitutionality, application and effect of the federal Employer's Liability Act, see notes in 47 L. R. A. (N. S.) 38; L. R. A. 1916C, 47.