[Civil No. 3294.   Filed November 10, 1933.]

[26 Pac. (2d) 1005.]

STATE OF ARIZONA and CHIRICAHUA RANCHES COMPANY, DOUBLE CIRCLE CATTLE COMPANY and FOUR DRAG CATTLE COMPANY, Appellants, v. MARION P. McEUEN, CLAYTON McEUEN and ARTHUR J. McEUEN, Appellees.

Mr. Arthur T. La Prade, Attorney General, and Mr. J. R. McDougall, Assistant Attorney General, for Appellant State.

Messrs. Chalmers, Fennemore & Nairn, Mr. J. Early Craig, and Messrs. Blake & Anderson, for Chiricahua Ranches Company, Double Circle Cattle Company and Four Drag Cattle Company.

Mr. J. Verne Pace, Messrs. Mathews & Bilby and Mr. T. K. Shoenhair, for Appellees.

LOCKWOOD, J.—This is an appeal from an order and judgment of the superior court of Graham county dismissing an action for the lack of jurisdiction. The proceeding in which the judgment and order were made was a statutory seizure of certain cattle, alleged to have been made· under the provisions of section 2106, Revised Code 1928, as amended by the Session Laws of 1931, chapter 43, § 11.

The facts necessary for determination of the questions involved in this appeal are not in serious dispute and may be stated as follows: For a long time prior to the fall of 1931, Chiricahua Ranches Company, Double Circle Cattle Company and Four Drag Cattle Company, hereinafter called appellants, had owned respectively the brands CCC, Double Circle, and C Four Drag. Marion P. McEuen, Clayton McEuen, and Arthur J. McEuen, hereinafter called appellees, had owned, the first the brands Diamond Bar, ZON and OD, the second the brand HAT, and the third. a brand variously named but which we shall call C Four Slash. We need not attempt to reproduce the exact appearance of each brand but shall refer to them as they are named above. Appellants and appellees each were in the possession of certain ranges located in Southern Arizona, which more or less adjoined each other.

In September, 1931, William Powell, one of the livestock sanitary inspectors, received orders from the livestock sanitary board to investigate the McEuen ranch, and in pursuance of such orders did so, taking along with him men representing appellants and various other cattle owners. Some 52 head of cattle were gathered by him on the McEuen range but half of them were shortly turned loose, 26 head being brought to Safford and placed in a corral in the custody of Ben Black. During November, 1931, livestock inspectors Hugh Bryan and Joe Dillman,

together with various cattlemen, again investigated the McEuen ranch and gathered 17 head of stock which were also turned over to Black and held, together with the other cattle.

Certain criminal charges were thereafter filed against one of the McEuens, and, after various proceedings, two stipulations, the one between the county attorney and the attorney for appellees and the other between the attorney for appellees and the attorney for appellants, were made. Thereafter and during the month of March the criminal cases were dismissed. Up to this time no effort was made by the livestock inspectors to make the statutory report and citation required by the Livestock Code to be made when cattle are seized thereunder, nor had anything further been done in regard to a change in their custody by either appellants or appellees.

On April 1st, 1932, Inspector Joe Dillman went out to the corral where the cattle were being held by Black and formally seized them, immediately filing a report of the seizure with the clerk of the superior court. The report is lengthy and we shall not quote it in full, but will refer to it from time to time as may be necessary. Of the 43 cattle originally delivered to Black only a part were included in the report of Dillman; it covering only 2 cows, each with a calf following it, and 1 bull, of the animals gathered in September, and 9 cows, 7 of which had calves following them, of those gathered in November. A citation was issued on the day on which the report was filed with the clerk of the superior court and served and posted on April 13th, in accordance with statute, the return day named therein being April 15th. On the return day appellants answered the citation, each claiming certain of the cattle described in the report. Appellees appeared and filed various demurrers and pleas in bar which were overruled by the trial court on May 24th. On June 6th appellees

demanded a jury trial and the cause was set for trial before a jury for June 24th, another judge than the one who had overruled the demurrers and pleas in bar being called in to hear the case on the merits. Thereafter appellees again demurred to the report and citation on practically the same grounds as they had raised in the demurrers which were overruled and answered making claim to the cattle involved in the report, and pleading the stipulations hereinbefore referred to as a bar to the claims of appellants. The case came to trial on June 24th before a jury, and, after some evidence had been presented, defendants moved to dismiss on the following grounds:

"First, there was no cause for seizure under the laws of this State as stated either in the Citation or Report of seizure.

"Second, that it appears from the evidence that the State Inspectors of the Live Stock Sanitary Board, the plaintiff in this case, did not proceed forthwith with the seizure proceedings as required by statute.

"Third, on the ground that it is apparent from the evidence that if any cause for seizure existed, there were two separate and distinct causes of action.

"Fourth, on the ground that the evidence shows that there were two separate and distinct seizures without any evidence as to the value of the cattle involved in each seizure and, therefore, there is nothing to show any jurisdiction of this Court to hear the matter in connection with either of the seizures.

"Fifth, on the ground that this is not a proper seizure case, as shown by the evidence, but wholly and solely and simply a controversy between private individuals as to the ownership of the property."

After argument, the court made the following order: "You will let the record show that the Motion of Mr. Bilby, representing claimants M. P. McEuen and Clayton McEuen, and the Motion of Mr. J. Verne Pace, representing claimant Arthur J. McEuen, is granted on the ground of lack of jurisdiction," fixed

a jury fee and discharged the jury. Formal judgment was signed as of June 25th dismissing the proceeding and assessing the costs, including the jury fee, against the appellants in proportion to the number of cattle claimed by each one of them during the proceedings.

The record shows that the trial court dismissed the action for lack of jurisdiction and the sole question now before us is, Did the court have jurisdiction of the case at the time the order of dismissal was granted or did it not?

We consider the various grounds assigned in the motion to dismiss in their order. The first is that there was no cause for seizure stated either in the citation or report. This requires that we consider somewhat at length the nature and requirements of the provisions of the Livestock Sanitary Code in regard to the seizure of cattle. The livestock business is one of the most important carried on in our state, particularly that portion thereof pertaining to cattle running at large upon the public range. As a natural result, our legislature has from the earliest territorial days enacted many laws in regard to the management of the industry and has amended the same from time to time as experience showed the necessity. One of the fundamental principles of the Livestock Code is that the *prima facie* ownership of range cattle is to be determined by branding and earmarking, and, in pursuance of this principle, many strict regulations have been laid down in regard to how brands shall be adopted and recorded, how they shall be used, and as to their effect. Among these regulations is found a summary method for determining the ownership of certain classes of range livestock. The procedure to be followed therein is set forth in sections 2106, 2108, 2109, 2110 and 2111 of the Revised Code of 1928, as amended by chapter 43 of the Session Laws of 1931 (sections 11, 13–16). The

section giving jurisdiction to initiate this summary proceeding is section 2106, which reads as follows:

"Sec. 2106. *Range Stock to be Branded; Seizure.* It shall be unlawful for any owner of range live stock to permit such stock, excepting unweaned animals running with their mothers, to roam and feed upon the ranges in this state unless branded and marked as prescribed by law. Every inspector shall seize any live stock, except unweaned animals running with their mothers, wherever found, not branded according to law, the ownership of which such inspector or other person questions, and any live stock having brands so mutilated, indistinct, burnt or otherwise disfigured as to be difficult of ascertainment, or upon which there is a brand which is not recorded as required by law, or which is freshly branded and not found with its mother, or which has a brand or mark not the recorded brand or mark of the owner, and any animals which are known as 'leppys,' 'orejanas,' 'sleepers,' 'dogies,' or 'mavericks.'"

Since the proceeding is a special one, no cattle may be seized and disposed of thereunder unless they come within the provisions of this section. To this statement of the law both appellants and appellees agree, but they differ widely as to the interpretation to be placed on the language of the section.

The first and most important principle of statutory interpretation is that the intent of the legislature is to be ascertained and followed. *Deyo* v. *Arizona Grading & Construction Co.,* 18 Ariz. 149, 157 Pac. 371, L. R. A. 1916E 1257. The second, at least in Arizona, is that statutes shall be liberally construed to effect their objects and to promote justice. Section 3038, Rev. Code 1928. These principles of interpretation take precedence over all others, the remaining rules being merely ancillary and used to assist in the proper application of the two above set forth. It is true that in the case of *Lacey* v. *Parks,* 9 Ariz. 241, 80 Pac. 367, we said:

" . . . It is a general rule applicable to all proceedings of this character, which provide for the summary disposition of property, that the statutes must be strictly followed, and a material departure from the procedure authorized will render the subsequent proceedings void. . . . "

This rule, however, does not apply to the interpretation of the statute, but to the application thereof, and even it holds that it is only a material departure from the procedure which renders the subsequent proceedings void. We shall, therefore, in determining the meaning of section 2106, *supra,* keep constantly before us these principles, disregarding any of the minor canons of construction which conflict therewith.

On examining section 2106, the title and the whole context thereof show clearly that the legislature had in mind at the time it adopted the section only range stock and not the ordinary domestic cattle kept in inclosures or buildings. The first sentence fixes the duty of owners of range cattle by stating that it shall be unlawful for them to allow such cattle to run at large, unless they are branded and marked as provided by law. The next phrase in the statute directs the cattle inspector to seize any livestock, meaning thereby, obviously, range cattle "wherever found," when any one or more of certain circumstances exist. These circumstances are (a) that the cattle are not branded according to law; (b) that the brands are disfigured so as to be difficult of ascertainment; (c) that there is a brand upon the animal not recorded as required by law; (d) that it is freshly branded and not found with its mother; (e) that it bears a brand or mark not the recorded brand or mark of the owner; and (f) that it is an animal known in range parlance as maverick or the like. It is plain from this recital that the animals which the inspector is authorized to seize are all those whose physical ap-

pearance in regard to the presence or absence of brands and earmarks would suggest to the casual observer familiar with range customs and the Livestock Code, that the ownership of the animal was doubtful. We think there can be no doubt that it was intended to make the right to seize range cattle under this section cover those animals and those only which by reason of their physical appearance in relation to their brands or lack of brands raised a doubt as to their ownership. Such being the case, we think the clause inserted in the middle of the section "the ownership of which such inspector or other person questions" was intended by the legislature to qualify all the cases for seizure and not merely the one which it immediately follows, and which it alone would qualify if we used for the construction of the clause only the ordinary rules of grammar. Read thus, the section in substance means: "If there are any animals whose physical appearance in regard to their brands or lack of brands, as specified in the section, causes the inspector or any third party to question their ownership they may be seized." The first prerequisite to the seizure is the physical appearance of the cattle. The second is the questioning of the ownership by some person by reason thereof. If these two factors appear, the right of seizure exists, otherwise not.

The law, after stating the circumstances under which cattle may be seized, then proceeds to define the duty of the inspector after the seizure. He must by the terms of section 2108 (a) safely keep and care for the cattle until disposed of, and (b) "forthwith report such seizure to the clerk of the superior court of the county where the stock is seized, or to an available justice of the peace of such county." The report of the inspector must give a general description of the livestock seized and the brands, if any, together with the place of and the reason for the

seizure, the probable value of such livestock, and ask that the owner be cited to appear and prove ownership.

The report of the inspector involved herein described the cattle carefully in regard to their brands, fixed their value at about $500, and then stated:

"These animals were seized by the undersigned because they were found running at large on the range at the place where first gathered, in the county and state aforesaid, and because they bore brands not the recorded brand or mark of the reputed owners which claim the said cattle, and because the ownership of said cattle by the owners of the brands 'HAT,' 'ZON' and 'Diamond Bar' and 'C Four Slash,' was questioned by the undersigned and by others including the claimants."

—and naming appellants as the claimants thereof, and stating that some of the brands on the cattle were owned by appellants and some by appellees. On examining the description in the report, it appears that each and every one of the mature cattle seized bore two brands, one brand, which was with one exception vented or barred, being that of one of the appellants, and the other brand being that of one of the appellees. All of the calves following their mothers were branded with the brand of one of the appellees alone. In view of the general procedure required after the report, we think it is reasonable to assume that the legislature meant such report to take the place of a complaint in an ordinary action, and that it should show the jurisdictional facts necessary to authorize the court to proceed with a hearing. On the other hand, it must be remembered that cattle inspectors are not as a rule skilled lawyers, and it is not to be presumed that the legislature meant their reports to be tested by the same technical rules of pleading as would be the complaint in the ordinary action. It is sufficient, we think, if within

the four corners thereof it reasonably appears that one of the reasons authorizing the seizure set forth in section 2106, *supra*, exists.

On examining the statement above set forth showing the ground of seizure as being "because they bore brands not the recorded brand or mark of the reputed owners which claim said cattle," and the fact that it says each and all of the mature cattle in question bore the brands both of the appellants and the appellees, but were gathered from the McEuen range, we think the report shows clearly that the seizure was made for a cause authorized by the statute.

It may be urged that because the brands of the appellants had been vented or barred, that such action in effect removed the original brand from the cattle so that they then bore but one brand, being the recorded brand of one of the McEuens. We think this claim is untenable. It is true that the venting or barring of a brand is sometimes done as a range custom to indicate that the animal in question has been sold by the owner of the vented brand to the person owning the unbarred brand. This is a convenient method of indicating to the casual observer by the owner of the clear brand that his claim to the cattle is based on an alleged purchase from the owner of the vented brand, and there is nothing in the statute forbidding a purchaser from using that method. It cannot, however, be used in the place of the bill of sale required under section 2116, Revised Code 1928, as amended by Laws 1931, chapter 43, section 21, to prove the title. For this reason we think a barred or vented brand, together with another brand not so barred or vented, on an animal authorizes the inspector, if the ownership of the animal is questioned by him or any other person, to seize it under the provisions of section 2106, *supra,* so that the true title thereto may be determined in the manner set forth in the Livestock Code.

The second ground for the motion was that it appears from the evidence that the livestock inspectors did not proceed "forthwith" with the seizure proceedings. The word "forthwith" does not mean within any particular time, but substantially with as much speed as is reasonably possible under the circumstances of the case. *Dickerman* v. *Northern Trust Co.*, 176 U. S. 181, 20 Sup. Ct. 311, 44 L. Ed. 423. If the seizure on which these proceedings are based is held as a matter of law to date from the time the cattle were first gathered by Inspector Powell in September, 1931, and by Inspectors Bryan and Dillman in November, 1931, it is obvious that a report made in April, 1932, was not made "forthwith." *Maryland Casualty Co.* v. *Industrial Commission,* 33 Ariz. 490, 266 Pac. 11. If, however, the real seizure upon which the report was made was, as stated in the report, on April 1, 1932, then the report was certainly made "forthwith."

This brings us to a discussion of the stipulations made in the criminal actions above referred to. The stipulation by the county attorney and the attorneys for appellee was made in the criminal cases, and contains the following provision:

"Immediately upon the motion for continuance having been granted, Counsel for the State agree to release all cattle bearing any brand or brands of the Defendant that have been seized and are now held in custody by the State Sanitary Board, to the above-named Defendant, save and except the cattle introduced in evidence in the preliminary hearing on the above-mentioned cases, namely, One (1) Red, ball-faced cow bearing the Double Circle brand, barred out and bearing the brand, Diamond Bar; 1 Red, ball-faced cow bearing the Double Circle brand barred out and bearing the brand, Diamond Bar, together with the calves belonging to each of the above-mentioned cows; also 1 Red, ball-faced yearling heifer bearing the brand CCC vented and bearing the

brand Diamond Bar; all other cattle now held, save those above excepted, will be released as hereinabove agreed.

"Counsel for the State further agree not to re-seize said cattle or any of them, or to attempt to seize any other cattle not branded after date hereof, to be used in evidence in connection with the above cases and further agree not to institute any other criminal prosecutions against the Defendant in connection with any of said cattle.

"In the event any civil action or actions shall be instituted hereafter by any party or parties laying claim to any of the above-mentioned cattle which are now held under seizure by the State Live Stock Sanitary Board, in an attempt to prove title to said cattle or otherwise gain possession of the same, it is hereby stipulated and agreed that such civil action shall not be tried until after all of the above-numbered criminal actions shall have been disposed of, and it is further agreed that none of the parties to any of such civil actions, in the event they are instituted, or the Defendant in this case shall be in anywise bound by any of the pleadings or other proceedings in such civil actions and no testimony taken and no pleadings filed in connection therewith shall be in anywise used in or referred to upon the trial of any of the above-numbered criminal cases.

"It is further agreed that in event said civil actions are instituted and tried prior to the disposal of the above-numbered criminal cases, said criminal cases will thereupon be immediately dismissed by Counsel for the State."

This, of course, was binding, if it was effective for any purpose, only between the state and the appellees in the pending criminal cases, and could of itself in no manner affect any rights of appellants in a civil proceeding. It should, however, be considered in connection with the stipulation between the attorneys for appellees and appellants in determining whether or not there was such an excuse for a failure to make an immediate report of the original seizure as would justify the later action of

Inspector Dillman in reseizing the cattle on the first day of April, 1932. This second stipulation reads as follows:

"In connection with the cattle bearing the brand of Marion McEuen which have heretofore been seized in connection with the criminal prosecutions or otherwise, and as a part of the stipulation for a continuance of said cases, which has this day been entered into, it is our further understanding and agreement with you, as Attorney for the Chiricahua Cattle Company and the Double Circle Cattle Company, that said cattle are to be permitted to remain in the corral where they are now located and be cared for by the State Live Stock Sanitary Board for a period of ten (10) days from date hereof, during which time said above-mentioned companies may institute replevin suits to recover them if they see fit.

"If said suits are not instituted within ten (10) days from date hereof, or if prior to the expiration of said time, you shall advise us that said suits are not to be instituted, and in such event said cattle are to be delivered to the possession of Mr. McEuen.

"It is further our understanding that in any civil actions that may be instituted for the recovery of said cattle, it is to be expressly understood and agreed that the said cattle when replevined are taken from the custody of Mr. McEuen, that such fact will be admitted upon the trial of any such cases."

Construing these two stipulations together, as they must be construed in order to determine their effect on the legal rights of the parties, we think they amount substantially to a tri-partite agreement that (a) the criminal proceedings instituted against Marion McEuen should be heard before any civil proceedings regarding the title to the cattle were tried; (b) that all of the cattle which had been gathered and held by the livestock inspectors should be permitted to remain where they were for ten days, during which time appellants might institute replevin suits for them if they saw fit; (c) that if the replevin

suits were not instituted within ten days, the cattle were to be returned to McEuen; and (d) that the state would hold three of the cattle for evidence in the criminal cases and would agree not to reseize any of the cattle released or seize any other cattle, *for the purpose of using such cattle as evidence in any criminal case.* We are of the opinion that these stipulations were sufficient to justify both the live-stock inspectors and the appellants in believing that it was not necessary or contemplated by any of the parties that a statutory report of the seizure of the cattle should then be made, and that they did not bar a subsequent seizure under section 2106, *supra,* of the cattle in question. It will be noted that the only agreement in regard to reseizure expressly refers to a reseizure for use as evidence in certain criminal cases, and not to a reseizure for use in a civil proceeding under section 2106, *supra.* It is true that the stipulation made by appellants was to the effect that if a replevin suit was not instituted within ten days from the date of the stipulation, the cattle should be returned to McEuen, but there was no stipulation by them that they could or would not later proceed under section 2106. We know of nothing in the law to prevent a cattle inspector seizing cattle a second time if he brings himself within the statutory requirements, when the matter has not been heard on the merits under the first seizure, and from Dillman's report it is evident that he did not base it upon the original gathering in September and November, 1931, but on his action taken on the first day of April, 1932. Such being the case, the court did not lose jurisdiction of the present proceeding because the livestock inspectors did not proceed forthwith to make a report on the first seizure.

The third ground for the motion is that there are two separate and distinct causes of action. This is

based upon the theory that the seizure under which the action proceeded was the two gatherings of the cattle made in 1931. As we have pointed out, this is not the case.

The fourth ground of the motion is based on the theory that there were two separate and distinct seizures, without any evidence as to the value of the cattle involved in each seizure. Since, as we have held, there was but one seizure under which the hearing was held, and since both the report and the evidence showed the value of the cattle so as to bring them within the jurisdiction of the superior court, the fourth ground is not well founded.

The fifth ground is that the evidence shows that the case is not a proper seizure case, but simply a controversy between private individuals as to the ownership of the property. Counsel for appellees apparently assume that if the evidence shows there is such a controversy, the case falls. This is not the law. On the contrary, one of the express purposes of the Livestock Code is to provide for a summary method of the trial of such a controversy when certain circumstances in regard to the brands of the cattle would raise a doubt as to their true ownership. For the foregoing reasons, we are of the opinion that the trial court had jurisdiction at all times up to the granting of the motion and judgment involved herein to proceed with and determine the case on its merits, and that it erred in dismissing the same for lack of jurisdiction. It is therefore necessary that the matter be remanded to the superior court for a new trial.

There are two other points raised on this appeal which it is advisable that we consider since a new trial must be held. The first is as to the right to a jury trial. Section 23, article 2, of the Constitution provides that:

"The right of trial by jury shall remain inviolate, but provision may be made . . . for waiving of a jury in civil cases where the consent of the parties interested is given thereto."

We have held that under this constitutional provision, the right of trial by jury is not extended but merely preserved as it existed when the Constitution was adopted. *Brown* v. *Greer,* 16 Ariz. 215, 141 Pac. 841; *Jenkins* v. *Skelton,* 21 Ariz. 663, 192 Pac. 249; *Donahue* v. *Babbitt,* 26 Ariz. 542, 227 Pac. 995. And that this applies in all cases, both at law and in equity. *Mounce* v. *Wightman,* 30 Ariz. 45, 243 Pac. 916, 44 A. L. R. 754. But that in equity cases the verdict of the jury is advisory only. *Donahue* v. *Babbitt, supra.* And that the failure or neglect to demand a jury at the time and in the manner provided by law constitutes a waiver of the right to a jury. *Jenkins* v. *Skelton, supra; Mounce* v. *Wightman, supra.* Section 3802, Revised Code 1928, states:

" . . . A jury may be demanded by either party in writing, filed with the clerk before the action is set, or may be demanded orally in open court at the time of the setting. If not so demanded the right to trial by jury is waived, and the action shall be tried by the court unless the court shall otherwise order."

It is first contended that the jury was waived because no demand was made therefor on the return day of the citation. This apparently is based on the idea that the return day is the day set for trial of the case. We think this is error. The return day of the citation is in effect similar to the day fixed in a summons for answering the complaint. Section 2111, Revised Code 1928, as amended by Laws of 1931, chapter 43, section 16, reads:

" . . . If any person appear at the time fixed for the hearing and claim said livestock or any thereof, his claim shall be stated and the judge of the court shall enter upon the court minutes the fact that such

claim was made and the hearing shall proceed as in trials of civil actions. . . . ''

We think this means that the proceedings from then on shall be the same as after answer filed in the ordinary action, and if demurrers or dilatory pleas are filed by any of the parties, as they may be under section 2111, *supra,* the case is not set for trial until after the disposition of such demurrers and pleas. As a matter of fact the record shows that a jury was demanded on the day the case was set for trial. We think this was timely and that the jury was not waived.

It is also urged by appellants that even if appellees were entitled to a jury trial the case was substantially an interpleader, which under the law has generally been considered an equitable matter, and therefore the verdict of the jury is not binding on the court. 33 C. J. 419. We think, however, the position is not well taken. The action is a special statutory proceeding summary in its nature and intended in some degree at least as a substitute for the old common-law action of replevin. Besides this, in an interpleader the complainant admits he has no interest in the subject matter of the controversy, while in this proceeding the property may be adjudged to the state. Under these circumstances we are of the opinion that if the right to a jury exists at all, it should follow the rule of the common law rather than the equity jury, and that the verdict is binding upon the court.

The last remaining question is raised by the state. The trial court in assessing the costs charged them against the claimant appellants in proportion to the number of animals claimed by them. It is their contention that under the provisions of section 2108, the costs in any event are a charge against the state, to be paid out of the livestock sanitary board funds. A material change was made in the Livestock Code in

1931 on this point. Prior to that date section 2108, Revised Code 1928, said nothing about the payment of the costs or expenses of the proceedings, while section 2112 provided that if the animals were not adjudged to any person, they should be forfeited to the state, sold, and the proceeds, after deducting "the costs, the keep of the animals seized, and costs incident thereto," should be remitted to the general fund of the state. There was no intimation as to what should be done in regard to costs when the animals were adjudged to a claimant. In 1931 (chapter 43, § 13) the legislature modified section 2108, which sets forth the duty of the cattle inspector up to the time of the return of the citation, and inserted therein the following sentence:

"The expense incurred hereunder shall be a charge against the state and shall be paid out of the 'seizure fund' or any unexpended moneys appropriated for the live stock sanitary board."

Section 2112, which previously fixed the disposition of the funds obtained when animals were not claimed and were sold by the state, changed the rule so that it now reads (as amended by Laws 1931, chap. 43, § 17), as follows:

" . . . The inspector shall immediately after the sale is made remit the entire proceeds of the sale to the board, together with an itemized statement of the expense of such seizure and sale, to be by it paid as other claims are paid. The amount so received by the board shall be remitted to the state treasurer, to be deposited in a special fund designated as the 'seizure fund,' which said fund may be used by the board for the enforcement of and compliance with the provisions of this chapter."

It will be noted that in this proceeding the seizure, which is the initial step to be taken, is made by the inspector representing the board, and not on process sued out by any of the claimants. The county attor-

ney is required to represent the state in the proceedings, and, if no claimant establishes his right to the cattle, it receives the proceeds from their sale. It is evident from reading the entire Code dealing with the subject of brands, and the summary action involved herein, that while the rights of individuals to the cattle seized may be litigated in the proceedings, the primary purpose of the legislature was to enforce the proper use of the law in regard to brands and earmarks. Under these circumstances the legislature apparently thought it was unjust that a claimant to cattle should be required to stand any of the expenses arising out of the seizure, and that the state should pay them as part of the necessary costs of enforcing the brand law. The trial court, therefore, on a retrial of the action should charge all the costs of the proceedings against the seizure fund or the appropriations made for the livestock sanitary board, in accordance with the provisions of section 2108, *supra*. The order and judgment appealed from are reversed and the case remanded to the superior court of Graham county for a new trial.

ROSS, C. J., and McALISTER, J., concur.