T. B. GILBERT v. W. H. CRADDOCK.

No. 13,558. (72 Pac. 869.)

SYLLABUS BY THE COURT.

1. STATUTORY CONSTRUCTION—*Repeal by Implication*. In order that a specific provision of a legislative act be repealed by the implication arising from the passage of a subsequent act, such subsequent act must contain that which was clearly intended to take the place of such specific provision.

2. ———— *Cities and City Officers*. A specific direction requiring the election of an officer of a city contained in a general charter act is not repealed by implication by the passage of a subsequent general charter act which recognizes the existence of such office but says nothing as to how he shall be elected.

3. ———— *Authority for Election of Mayor*. Authority for the election of a mayor may be found in the necessary implication from an act of the legislature, as well as in its express terms.

4. ———— *"Necessary Implication" Defined*. A necessary implication does not shut out every other possible or imaginary conclusion, but is such an one as under all the circumstances a reasonable view impels us to take, the contrary of which would be improbable and absurd.

5. ———— *Power of Courts*. In drawing such implication, courts may read the entire act as well as past acts *in pari materia*, take into consideration the purposes and scope of the act, the inconveniences, inconsistencies and absurdities of a contrary view, and the general policy and character of our institutions.

6. ———— *City Charter Act of 1903 Construed*. Although no express provision is found in the charter act of cities of the first class passed in 1903 (Laws 1903, ch. 122) for the election of mayors in such cities containing more than 50,000 inhabitants, there is found therein implied authority for such election.

7. ELECTIONS—*Oath and Bond Unnecessary Before Quo War-ranto.* Until the canvassing board, whose duty it is to canvass the votes cast at an election, to declare the result thereof, and to issue a certificate of election to the one found to have been elected, has done so, or something equivalent, so that the claimant has some authoritative evidence of his election, he is not required to qualify himself to hold such office by taking the oath of office and filing his bond; he may maintain an action in *quo warranto* to determine whether he is elected without having done so.

8. OFFICE AND OFFICERS—*Mayor and Councilman—Incompatibility of Offices.* One holding the office of councilman may be elected to the office of mayor of the same city, and upon being qualified may take such office without first resigning the office of councilman. The two offices being incompatible, the acceptance of the latter vacates the former, and this without the prior consent of the mayor-and councilmen.

Original proceedings in *quo warranto*. Opinion filed June 6, 1903. Judgment for plaintiff.

*J. W. Dana*, *Nathan Cree*, and *Silas Porter*, for plaintiff.

*Frank Doster*, *T. A. Pollock*, *C. F. Hutchings*, and *L. W. Keplinger*, for defendant.

The opinion of the court was delivered by

CUNNINGHAM, J.: his is an original proceeding in *quo warranto* to determine who is entitled to the office of mayor of Kansas City, a city of the first class having more than 50,000 inhabitants. The plaintiff was a candidate for that office at an election held April 7, 1903, and, out of 12,986 votes cast, he received 7735, a majority of 2484. The defendant was elected mayor in April, 1901, and has served since that time. He now claims that he is entitled to continue in office because there was no warrant of law for the election of a mayor in April, 1903; that in the newly revised charter act of cities of the first class, adopted by the l gislature at its session of 1903 ( Laws 1903, ch. 122 ),

there is no provision for the election of a mayor in such cities having more than 50,000 inhabitants. This calls for an examination of the law and the provisions of the charter act and an inquiry into the proper construction of the same relative to this matter. The sections of the new act bearing most immediately upon the question involved read as follows :

"SEC. 12. All elections for city officers shall be held on the first Tuesday in April of each year."

"SEC. 16. In each odd-numbered year there shall, in all cities having less than fifty thousand inhabitants, be elected a mayor, city attorney, city clerk, city treasurer, police judge, and one councilman from each ward, who shall hold their offices for two years and until their successors are elected and qualified. In all cities containing more than fifty thousand inhabitants, the mayor shall appoint a city counselor, who shall be confirmed by the council, and who shall hold his office for a period of two years, unless sooner removed, and said city counselor may be removed at any time by the mayor without cause, and whose authority shall be superior to and whose duties shall be coextensive with those of the city attorney, together with such other duties as the mayor and council shall prescribe. . . . The mayor shall also appoint a police judge, who shall be confirmed by the council, and who shall hold his office for a period of two years, unless sooner removed, and said police judge may be removed at any time by the mayor without cause. . . . City clerk, city treasurer and city attorney shall be elected as herein provided for other cities of the first class. . . . The mayor may appoint such other officers as are created by ordinance, who shall hold their offices for a period of two years unless sooner removed, and such officers may be removed at any time by the mayor without cause."

"SEC. 19. The term of all elective or appointive officers shall be two years and until their successors are elected and qualified."

Article 4 enjoins many and varied duties upon the

mayor, and makes him, in connection with the coun-
cil, the legislative department of the city, while article
5 defines the duties of the mayor in connection with
the executive department.  Section 77, being one of
the sections of article 5, is :

"When any vacancy shall happen in the office of
mayor by death, resignation, absence from the city,
removal from office, refusal to qualify, or otherwise,
the president of the council for the time being shall
exercise the duties of the office of mayor, with all the
rights, privileges and jurisdiction of the mayor, until
such vacancy is filled or such disability is removed,
or, in case of temporary absence, until the mayor shall
return ; and in case of such vacancy, other than tem-
porary absence or disability, the person exercising the
office of mayor shall forthwith cause a new election to
be held, giving ten days' notice by proclamation."

Now it is claimed by the defendant that because the
word "mayor" is left out of the third paragraph of
section 16, which provides for the election of city clerk,
city treasurer and city attorney in cities of the first
class having more than 50,000 inhabitants, and because
there is not elsewhere in the act found any provision
explicitly providing for the election of mayor in such
cities, there was no authority under the law for the
people to elect a mayor on the 7th day of April, 1903,
and therefore the defendant, who is the incumbent of
the office by reason of his election in 1901, is entitled
to hold over indefinitely.  The question put concisely
then is, By the omission of the word "mayor" from
the list of officers to be elected as indicated in the third
clause of section 16, did the legislature intend that
that officer should no longer be regularly elected by
the people, and that the mayor found in office upon
the taking effect of this act should hold over indefi-
nitely—for life, maybe—or is there authority, ex-
press or implied, to be found in the act, or elsewhere

in the law, for the election of mayor in cities of the first class having over 50,000 inhabitants, at stated intervals? Plaintiff claims, first, that there is express authority in the statute, elsewhere than in the new charter act, for holding the election; and, second, that implied authority for holding such election is found in the express provisions of that act.

By the charter act of cities of the first class passed in 1868, the legislature provided that, commencing with the first Tuesday in April, 1869, and each alternate year thereafter, "an election shall be holden by the authorities of each city governed by this act, for mayor, . . . who shall be elected for the term of two years, and shall hold their respective offices until their successors are elected and qualified." Here is found specific authority for the election of a mayor by the people. In 1874 the legislature passed an act, probably designed to cover the entire field concerning the government of cities of the first class, which specifically provided the manner for the election of councilmen but made no such provision in the case of mayor. It did, however, direct that all existing laws not inconsistent with this act should remain in full force. Thereby the law for the election of mayor found in the statute of 1868 remained in force. In 1875 an amendment to the act of 1874 was adopted, whereby provision was made for the election of a mayor on the first Tuesday of April, 1877. This act, however, contained no direction for such election in any subsequent year. The repealing clause again went only to such acts or parts of acts as were inconsistent with its provisions. In 1881 the legislature again undertook to enact a complete charter for cities of the first class, which provided for an election of mayor on the first Tuesday in April, 1881, but made

no provision for his election in any year thereafter, although it did make specific provision for the election of councilmen in subsequent years.   Again, by this act only such acts and parts of acts theretofore enacted and in conflict therewith were repealed.   It, however, specifically repealed the acts of 1874, 1875, and 1877, but did not repeal the law of 1868.   It would seem by the usual rules of construction that, by this careful enumeration of all other provisions and acts except the law of 1868, the legislature designed to save this general act of 1868. Without further change the law thus stood until 1895, when the legislature directed that on the first Tuesday of April, 1895, there should be elected a mayor and certain other officers in all cities of the first class, but made no provision for the election of mayor in any subsequent year.   Again, the repeal was limited to acts and parts of acts inconsistent therewith.   This brings the history of legislation in respect to this matter up to the charter act of 1903. This act is very full, but it provides in express terms : "All existing laws and ordinances not inconsistent with the provisions of this act shall remain in full force and effect."

It was under the provisions of the law of 1895 that the defendant was elected mayor of Kansas City in 1901, and if his election was legal and his holding now is justified under the law it must be either by concluding that the specific direction for continuing the election of mayor of cities of the first class on the first Tuesday in each alternate year after 1869, as contained in the law of 1868, authorized it, or, that under the act of 1895, which was in force in 1901, and in which no more specific provision is found on this subject than in the law of 1903, was implied authority

to elect a mayor in cities of the first class. In other words, the *de jure* title of the defendant is affected with as great infirmity as he claims the title of the plaintiff to be. It is suggested, however, by the defendant that the acts of 1874, 1881, and 1895, purporting as they do to cover the entire ground of the subject, may repeal by implication all of the provisions of the act of 1868. If these acts cover the entire ground, then they require by implication the election of mayor—else they would not serve to repeal the 1868 act—and this would be sufficient answer to the contention of the defendant. If they do not cover the entire ground, then the provision of the law of 1868 specifically requiring the election of mayor remains in force. The defendant is therefore empaled upon one or the other of the horns of this dilemma.

We think there are very cogent reasons for the conclusion that the provision for the election of mayor found in the act of 1868 is yet in force. Certain it is that it has never been specifically repealed. If repealed at all, it is by implication. But such repeals are not favored by the courts, and to be permitted they must be plainly so intended, and if by an act concerning the same subject-matter, the entire subject must be covered. Clearly in this case the later acts did not cover the entire subject, as one of the most important matters—according to defendant's contention—to wit, the election of mayor, was omitted.

Assuming, however, that the effect of the passage of the subsequent charter acts was entirely to wipe out the provisions of the law of 1868, we will pass to the inquiry whether there is found in the express provisions of the present act, read in the light of the former acts, which are *in pari materia*, sufficient implied authority for the election of mayors of cities of

Gilbert v. Craddock.

the first class having more than 50,000 inhabitants. It is admitted that such authority may arise by implication. To be sure, the implication must be a necessary one. It may be drawn from public policy; past acts; the entire terms, purposes and scope of the act to be considered; the inconvenience, inconsistencies and absurdities involved in the contrary consideration—indeed, from all things found in the act, the conditions surrounding it, the history antedating it, the purposes to be accomplished by it, and the policy dictating it. An act of the legislature is like any other writing in this respect. Its purposes are to be gathered from all of its terms. (Suth. Stat. Const. § 239.) A necessary implication does not mean to shut out every other possible or imaginary conclusion, from which there is no possible escape, but means one leading to such a conclusion as, under the circumstances, a reasonable view impels us to take, the contrary of which would be improbable or absurd. Speaking upon the matter of implications in the consideration of statutes, it is said in Black on Interpretation of Laws, page 62:

"This doctrine does not empower the courts to go to the length of supplying things which were intentionally omitted from the act. But it authorizes them to draw inferences, from the general meaning and purpose of the legislature, and from the necessity of making the act operative and effectual, as to those minor or more specific things which are included in the more broad or general terms of the law, or as to those consequences of the enactment which the legislature must be understood to have foreseen and intended. This is not the making of law by the judges. It is educing the will of the legislature by the logical process of inference. 'It is a rule of construction that that which is implied in a statute is as much a part of it as what is expressed.' And as a statute must al-

23—67 KAN.

ways be construed with reference to the preexisting law, it will often happen that many details are to be inferred from the general language of the act, which are understood as necessarily involved in it though not enumerated."

On the same subject it is said in Sutherland on Statutory Construction, section 336 :.

"A necessary implication means not natural necessity, but so strong a probability of an intention that one contrary to that which is imputed to the party using the language cannot be supposed."

Let us then turn to a consideration of the general scope and some of the particular terms of the act in question. Nowhere in the act is the office of mayor specifically created. That it exists is recognized in numerous instances. The functions and duties of the mayor in his various relationships are specified and defined. The clear implication exists that the office of mayor is created by the act. If the office is created and duties imposed upon the one occupying it, it follows of course that the legislature intended that such officer should be selected in some manner. There are but three suggested ways in which this could be done : (1) By appointment; (2) by election; (3) by the continuance in office of the one holding it at the time of the taking effect of the act—for life, or until he should resign or be removed. As no provision is found in the act by the remotest implication for the appointment of mayor, we are shut out of the conclusion that he is to be appointed. It must therefore be that he is either to be elected at the time of the election provided for by the statute to hold for the term indicated, or that the one holding the office at the time of the taking effect of the act was to hold over in that office for an indefinite length of time, terminated only by death, resignation, or removal from

office. This last conclusion is contrary to, and inconsistent with, the provisions of section 19, which limits the term. It is inconsistent with the practice that has always heretofore obtained in this country and, so far as we are informed, in all other countries. It is inconsistent with the entire theory of our government. Running through our entire system is the principle that legislative and executive officers must at stated intervals have their acts reviewed at the polls by the body of the electorate. That the legislature intended to give any one of these officers a life or indefinite tenure of office passes the bounds of belief, in the face of all our traditions, and in the face of section 2 of article 15 of our constitution, which directs that the legislature shall not create any office the tenure of which shall be longer than four years.

Now let us see what we find in the act implying a purpose that the office should be filled by election. In section 77 it is provided that when a vacancy shall happen in the office of mayor, by death or resignation, a new election shall be held for the purpose of filling such vacancy. This is a clear implication that a former election had been held. No new election could be held unless an old one had been had. A new election in this connection means another election and presupposes a prior election. That this implication arises from this language is admitted by the defendant, but he limits it to elections which are elsewhere in the act especially provided for; that is to say, that when section 77 speaks of a vacancy in the office of mayor and provides a new election to fill such vacancy it means a vacancy occurring in the office of mayor in cities of the first class containing less than 50,000 inhabitants, because elections in such cities are only provided for. To our minds this is

doing violence to the language of the section, and is reasoning in a circle ; it excludes from the operation of the section a class of mayors which are not excluded by its terms. We think this language applies to all mayors of all cities of the first class.

Again, section 12 provides when elections, that is, general elections, shall be held—on the first Tuesday in April of each year. Section 16 directs that the election of general officers be held in the odd-numbered years. Section 19 limits the term of office of all elective or appointive officers. Reading all these sections and provisions together, and we discover, by inference, that the office of mayor is thereby created (by inference from section 77); which office shall be filled by election (section 12) at the regular election held on the first Tuesday in April (section 12) in each odd-numbered year (section 16) ; that he shall hold his office for the term of two years and until his successor is elected and qualified (section 19). "When any vacancy shall happen in the office of mayor by death, . . . the person exercising the office of mayor shall forthwith cause a new election to be held" (section 77). Implications much similar to the ones here made were invoked to give coherency and effect to statutory and constitutional provisions in *The State of Kansas, ex rel. Crawford, v. Robinson and others*, 1 Kan. 17 ; *The State, ex rel. Watson, v. Cobb*, 2 id. 32 ; *The State, ex rel. Goodin, v. Thoman*, 10 id. 191.

Section 16 specifically provides that councilmen in office at the time of the taking effect of the act shall continue to hold until their terms expire. Had the legislature designed to continue the incumbent mayor in office, would not some similar language appropriate to that end have been used ? No such language was used. Defendant's contention rests upon

an implication arising from an omission and not upon express provision.  Is it not highly probable that if the legislature had intended to introduce so strange, inconsistent, unprecedented and revolutionary an innovation into our form of government, it would have done so in unmistakable and express terms, and not left it to an implication derivable only from an omission?  Certainly an implication much less strong will be required to uphold a construction maintaining the consistence and uniformity of our law than to introduce so great an anomaly as that upon which the claim of the defendant rests.

The fact remains that since 1874, with the exception of the elections in 1877 and 1895, the law has been as questionable as now, yet all this time the legislature, by its various revisions, and the people, by a quarter of a century of elections held under it, have given a construction such as we deduce therefrom, a construction never before questioned, and upon the correctness of which rests, not only the validity of the defendant's *de jure* title now and during his entire term, but even his claim to hold over; for, under section 19, which is the only section upon which such a claim can be made, it is only as an *elective* officer that he can claim that right.

We are of the opinion then that warrant for holding the election of April 7, 1903, is found in the express terms of the unrepealed provisions of the law of 1868, and also in the implied provisions of the new charter act of 1903.  We find no inconsistency in thus holding as to both.  Indeed, beyond doubt the implications found in the later act are such because of the existence of the former.  The various acts coming on down from 1868 recognize that one, and are based upon and referable to it, and the last is explained and made efficient by it.

Defendant further contends that the plaintiff should not prevail because he has neither pleaded nor shown that he has qualified himself to hold such office by taking the oath and giving the bond required by the statute. The petition inferentially shows that he has filed no bond, as it alleges that "he is ready, able and willing to file his official bond as mayor of said city, with the clerk of said city, to be by him presented to the mayor and council of said city for their approval." As no demurrer was filed or objection made to the introduction of evidence, the question is really whether the evidence shows a right to recover, and not as to the sufficiency of the allegations of the petition. This evidence shows that the city council met as a canvassing board at the time required by the statute to canvass the vote cast on April 7, and did canvass it for all officers except mayor. As to that the defendant, as presiding officer, entertained, put, and declared carried, a resolution to the effect that the board refused and declined to canvass the vote for the reason that there was no law authorizing or providing for the election of mayor at that election. In obedience to the order of a peremptory writ of mandamus, the board convened on the next day to canvass the vote. The defendant again presided. After having passed a resolution protesting against such canvass, alleging the same reason as they did in the resolution of the day before, the board made the canvass and directed a record of the vote to be made. There is no evidence to show that any declaration of the result was made, or that any certificate of election was given to the plaintiff. Under these conditions, is it necessary that the plaintiff should have taken the oath of office and given bond prior to his bringing this action? It is true that these prerequi-

sites are necessary before the plaintiff would be entitled to hold the office. It is further true that, should he neglect or refuse for more than ten days after being entitled to hold office to qualify himself by doing so, he would be deemed, under the provisions of the statute and ordinance, to have declined and forfeited the office. Until the board, whose duty it was to determine the fact, had declared him elected and had issued a certificate evidencing the same, he was not called upon or indeed entitled to take the oath of office, or give the required bond. It would have been an idle ceremony for him to do either under the circumstances of this case. The defendant and a majority of the council were saying to him : "You are not elected ; you are not entitled to hold the office." How useless it would have been, to say nothing more, to have tendered to such body the oath and bond of office ? It would seem, under the provisions of our statute, that this action, when prosecuted by one claiming a right to an office, is for the purpose of determining the plaintiff's right to the certificate of election, which carries with it the right to qualify and hold, for the statute provides : "If judgment be rendered in favor of the plaintiff or person entitled, he shall proceed to exercise the functions of the office after he has been qualified as required by law." (Gen. Stat. 1901, § 5152.) The supreme court of Michigan, in *The People v. Miller*, 16 Mich. 56, 58, said : 

". . . Was the latter bound, before he could maintain this proceeding, to test the right to the office, to tender his bond, or to take or offer to take the oath of office ? This is the only remaining question. We think the statute requiring the oath and bond must be construed to apply only to persons holding the certificate of election, those whose rights are admitted by the person holding it, and those who, with-

out having the certificate, have obtained a judicial determination establishing their right to the office. The certificate of election, whether rightfully or wrongfully given, confers upon the person holding it the *prima facie* right of holding for the term. And this *prima facie* right is subject to be defeated only by his voluntary surrender of the office, or by a judicial determination of the right.

"We find nothing in any of our statutes warranting the inference that the legislature ever contemplated requiring any person, claiming to have been elected to an office, to take the oath or file the bond, while another person, holding the certificate of election, is in possession of the office under the certificate, refusing to yield to the claim, and the right has not yet been tried."

In *State v. Frantz*, 55 Neb. 167, 171, 75 N. W. 546, where the respondent was in the possession of the office having a *prima facie* right to it by reason of his holding a certificate of election, and where the relator had no certificate, his election being denied by the respondent, it was held:

"We know of no case holding that there is any right given or duty imposed on any officer or board to approve an official bond offered by one who possesses no competent evidence whatever of his election or appointment. Had the relator presented his bond as treasurer to the county board of Saline county, that body would have no right to approve it and thereby recognize his title to the office. Mr. Frantz held the certificate of election, and that was to them conclusive evidence of his right until the conflicting claims of the parties should be judicially determined in a proper proceeding. Consequently nothing would have been gained—no useful purpose would have been served— by the execution and presentation of an official bond. (*People v. Miller*, 16 Mich. 56.) The logic of respondents' contention, therefore, is that the relator lost his right to the office by failing to have that done which, under the circumstances, was legally impossible of

performance. We do not think the statute should receive so narrow an interpretation. We think that the failure of Barton to have his bond executed and approved within the statutory period was not the result of his neglect, and that section 15 aforesaid has no application to cases of this character. Such failure, according to the averments of the information, was entirely due to the negligent or wilful omission of the precinct boards to discharge the duties imposed upon them by law. It seems to us that the act in relation to proceedings by *quo warranto* governs the case. Section 711 of the code of civil procedure provides that if judgment be rendered in favor of one claiming an office he shall proceed to exercise its functions after he has qualified as required by law. This provision evidently contemplates that the successful claimant shall qualify after judgment of ouster and proceeds on the assumption, of course, that he did not qualify before. . . .

"Our conclusion is that the relator may prosecute this action without having qualified as treasurer of Saline county, and that if he shall be successful he may be inducted into office upon giving, and having approved, his official bond with the oath of office indorsed thereon."

(See, also, *People v. Scannell*, 7 Cal. 432; *People v. Potter*, 63 id. 127; *Pearson v. Wilson*, 57 Miss. 848; *State, ex rel. Attorney-general, v. Steers*, 44 Mo. 223; *State, ex rel. Heath, v. Kraft*, 18 Ore. 550, 23 Pac. 663; *The State, ex rel. Ackerman, v. Dahl*, 65 Wis. 510, 27 N. W. 343.)

It could hardly be expected that plaintiff would take the oath and file a bond to qualify him for the exercise of the duties of an office out of which he was being kept, and which he was uncertain he would ever be permitted to occupy. At least, this question can hardly be raised by one keeping him out of the office and wholly denying his right thereto. It is proper to add that the evidence shows that the plain-

tiff did take and leave with the city clerk an oath of office before this action was commenced, and also that an official bond is in the hands of the clerk, but when left with him is not exactly shown.

The plaintiff was elected as one of the councilmen of the city at the election in 1902. His term as such would not expire until April, 1904. The defendant urges as an additional reason why the plaintiff should not prevail that, as he cannot hold the offices of mayor and councilman at the same time, he cannot resign his office as councilman unless his resignation be accepted by the body which is called upon to fill the vacancy, to wit, the mayor and council; and that that body, by resolution, has declared "that we and each of us do hereby refuse to consent to said Thomas B. Gilbert's resigning, vacating or abandoning his said office as councilman, and declare him, by reason of the incompatibility of the office of mayor and councilman, to be ineligible to take or hold the office of mayor of the city of Kansas City, Kan." Granting that the office of mayor and councilman are incompatible, and that the duties of both may not be exercised by the same person at the same time, a councilman is not thereby rendered ineligible to election to the office of mayor. Granting, further, that the resignation of an officer is not completed until it is accepted by the body empowered to appoint a successor, still the contention of the defendant would not be sound. There are ways plaintiff may lay down the office of councilman other than by resignation. One of these is by the acceptance of an incompatible office. (23 A. & E. Encycl. of L., 2d ed., 427.) This would not require the concurrence of the mayor and council. When he shall be inducted into the office of mayor, he thereby vacates the office of

Gilbert v. Craddock.

councilman.   He cannot hold both at the same time, but he may carry on the necessary legal proceedings to obtain the adjudication of his right to assume the office of mayor while he is yet councilman, just as he may carry on the effort to be elected as mayor while he is yet councilman ; they are both means to the end of actually becoming mayor.

After the election and before the council convened as a canvassing board, and with the knowledge of his election given to him by common report, the plaintiff sat and voted with the city council, and it is claimed that by so doing he waived his right to claim the office of mayor and elected to continue in the incompatible office of councilman.   We find no merit in this contention.   He did not know, as a matter of law, that he was elected mayor.   It required the official canvass of the vote to establish that fact.   He had not received his certificate of election, which was the official evidence of it.   He had no legal right to enter upon the office of mayor at the time he was exercising the duties of councilman.   There was therefore no adverse election by such exercise.

Judgment must be entered for the plaintiff.

All the Justices concurring.