[Civil No. 3879.   Filed May 22, 1937.]

[68 Pac. (2d) 694.]

W. P. MAHONEY, ETHER HAYNIE, RAYMOND F. MARQUIS, BERNARD MacDONALD, DR. JUNIUS GIBBONS, as Members of and Constituting the Arizona Board of Social Security and Public Welfare, and LEE GARRETT, as Commissioner of the Arizona Board of Social Security and Public Welfare, JOHN A. FOOTE, as Chairman of the Maricopa County Board of Social Security and Public Welfare, and R. M. JAMISON and ROY McCARTHY, as Members of Said Board, Appellants, v. COUNTY OF MARICOPA, a Political Subdivision of the State of Arizona, Appellee.

480

Mr. Joe Conway, Attorney General, and Mr. E. G. Frazier, Special Assistant Attorney General, for Appellants.

Mr. Harry Johnson, County Attorney, and Mr. Mark B. Wilmer, Deputy, for Appellee.

PER CURIAM.—This is an appeal from a declaratory judgment of the superior court of Maricopa county, holding that it is the duty of the Arizona Board of Social Security and Public Welfare and of the Maricopa County Board of Social Security and Public Welfare to assume the obligation of caring for, providing, and administering general home relief, outdoor and

indoor care, and medical care for persons in need, old age assistance, aid to the blind, and aid to dependent children, as provided in chapter 69, Laws Regular Session of the Thirteenth Legislature, and that no duty rests upon the county of Maricopa to do any of said things.

The question before us involves a determination of the duty resting upon the public authorities of the state to furnish aid to those of its inhabitants who cannot care for themselves. In order to do so, we think it necessary first to give a brief *résumé* of the law upon this subject as it existed in England and America from earliest times, for it is only in the light of the background of any law that its true intent, purpose, and effect may be understood. As we have recently said in the case of *Masury & Son* v. *Bisbee Lumber Co., ante,* p. 443, 68 Pac. (2d) 679, the common law of England, except as modified by local circumstances and conditions, was brought to this country and is a part of our law. Under that law, there was no such thing as relief of the distressed individual by public authority. Indeed, in a nation such as England was during the formation of the common law, there was very little necessity for it. The country was almost purely agricultural, the factory system and the large town or city being unknown. Almost the entire population obtained its livelihood from the land, and this was held either by small yeomen who worked their farms with the aid of their families, and perhaps a few laborers who were to all intents and purposes treated as members of the family, or by the great feudal landholders who maintained an almost patriarchal attitude towards their tenants and dependents. The small amount of relief that was necessary was generally furnished by the great monasteries, which were found in all parts of the kingdom, and by bequests for charitable purposes administered, in a large degree, by these

same institutions. Shortly after the great epidemic of the Black Death visited Europe, the situation began to change. A large portion of the population of England had perished in that terrible epidemic and much land lay vacant. At the same time the rising industry of the Netherlands made the production of wool more profitable to the large landowners than ordinary farming, and as a result a great portion of the previously cultivated land was transformed into sheep runs. This naturally decreased the need of agricultural labor, and since feudal ideas were weakening, more and more men found themselves unable to secure the only kind of work with which they were familiar. When the monasteries were dissolved in the time of Henry the Eighth and this source of relief was thus cut off, conditions rapidly grew worse, and it was apparent that legislation of some kind was necessary to provide for those who could not support themselves. It was, therefore, at this time that the public authorities first recognized and accepted their responsibility for the care of those who could no longer care for themselves, and the policy began to appear in English law that each local community should care for its own poor. At first this was confined merely to the class which we commonly call the "unemployables," but for the reasons aforesaid, it was soon found that many who were able and willing to take employment could not find it, and the Elizabethan statute of 1576 was a comprehensive poor law, aiming at the complete and systematic maintenance of the indigent needing relief, including both the unemployables and the employables. The fundamental principles of these laws were two-fold: First, the relief was local and granted only to those who had a legal residence in the particular taxing unit, such as the parish or the county, and, second, the man who was able to work should be made to work. As time went on, this last principle became

more and more rigidly enforced until the theory underlying relief was that only the unemployable class had a moral right to aid, and that the able-bodied man who was out of work had himself to blame, and should be as little a burden on the community as was possible.

This was the general view of the distribution of relief in England during our early colonial history, and naturally the colonies took, to a great extent, the same point of view. It was universally held that relief was statutory only in its nature, and was, therefore, regulated solely by the terms of the local statute, and these statutes usually adopted the prevailing English theory to a great extent in language and to an even greater extent in administration. There was perhaps more excuse for that view in America in the eighteenth and early nineteenth century than in England. This country was not only an agricultural community, but one with what seemed to be boundless free land available to any man who had a strong body and willing hands. When such a man could no longer obtain work for wages, it was comparatively easy for him to secure a farm of his own, where he could at least make a decent living for himself and his family.

This was the background for Arizona's first laws in regard to poor relief, and naturally they reflected the current political and economic theories. The Howell Code of 1864 made no provision for aid to the able-bodied man or woman, no matter how destitute. It did, however, attempt to care for the unemployables. It declared first, in substance, that the nearest relative of such unemployable, who was able to do so, must furnish the necessary relief, and, second, that the counties would care for those of that class who had no relatives able to provide for them. It also recognized the principle of settlement found in the old English law, for it was made a misdemeanor to move an indigent from the county in which his legal settle-

ment existed for the purpose of getting aid from some other county. In 1887 a revised code was adopted which changed materially the system of relief. All reference to assistance by relatives was eliminated, as were the provisions in regard to settlement, and the duty was placed on the boards of supervisors of the various counties, as follows:

"397. . . . 5. To provide for the care and maintenance of the indigent sick, or the otherwise dependent poor of the county; erect offices, and maintain hospitals therefor, or otherwise provide for the same."

It will be seen by the language used that for the first time it was intimated that others than unemployables might, as a matter of discretion on the part of the boards of supervisors, receive aid from the county. This provision was continued substantially in the same form in the Codes of 1901 (par. 973, subd. 5), 1913 (par. 2418, subd. 5), and 1928 (§ 774, subd. 5). The Code of 1901 also provided that the care of the indigent sick of the county, including medical attendance, medicine, food, lodging, and clothing might be let by contract, and limited public relief of any nature to indigents, the term meaning, according to section 1033, Revised Statutes of Arizona of 1901, any person who was "sick, poor or disabled and unable to pay for subsistence, care or medical attendance, or either." These provisions were carried over into the Code of 1913 (par. 2486), slightly modified in language, but the same in substance. The Code of 1928 (§ 814) also contained substantially the same provisions, with this important exception, that instead of providing that the indigent must be "sick, poor or disabled *and* unable to pay for subsistence," etc. the "and" was changed to "or," thus for the first time specifically stating that public aid might be furnished to the employables as well as the unemployables, who were unable to care

for themselves. The practical administration of this relief, however, was limited almost entirely to the unemployables and was usually carried on by institutional care in the various county hospitals established by the supervisors, or in some counties by a small amount of direct outdoor relief, either in cash or supplies, at the discretion of the supervisors. In the vast majority of cases, this relief was not extended to the able-bodied man who was presumably temporarily out of work. He was still dependent upon his own resources, that of his relatives, or, in extreme cases, private charity such as the Salvation Army or the soup kitchen.

This was the situation existing in Arizona in the beginning of 1933. All public relief was administered by the boards of supervisors of the different counties, limited by statute as above referred to, and also by the customary application thereof, and the funds were raised by the supervisors as part of the incidents of ordinary taxation. The burden was comparatively light, relief being, if not one of the smallest, certainly not one of the largest items of the ordinary county budget. In 1929, however, the situation began to change. The greatest economic depression of modern times spread rapidly over the civilized world, and America, by that time one of the most highly industrialized of nations, felt the full force of the blow. The productive free land which had cushioned the depression of 1857, 1877, and 1893 was exhausted, and even had it been available, most of the generation which had grown up since the beginning of the century knew nothing of farm life. With anywhere from 10 to 30 per cent. of the wage-earning population of the country unable to obtain employment on any terms, and with the vast majority having little or no savings to fall back upon, it was soon obvious that the burden of relief was far too great for the ordinary machinery

to care for, and the national government set the example, quickly followed by the various states, of providing general aid of some nature, not merely for unemployables but for the unemployed. The first radical change in Arizona was made by the adoption of chapter 35 of the Regular Session of 1933. In substance, it provided for a board of five members, called the State Board of Welfare, appointed by the Governor, who were given certain powers. These powers may be summarized under three classes, (a) to study the general subject of poverty and unemployment, inspect all institutions carrying on welfare work, and to make recommendations as to such work, (b) to cooperate with the counties in the care of the indigent sick and dependent poor, either directly or through the county boards of public welfare created by the act. The supervisors, however, in such cases were required to finance the care, the administration only being in the hands of the state and county boards of welfare, and (c) to administer any state funds that might be provided or made available for the relief of destitute or necessitous persons. It will be seen that the power of this board, so far as general relief was concerned, overlapped the exercise by the county of its long continued care and maintenance of the indigent sick and dependent poor, for it could only supersede the plenary control of the supervisors over this work when the county requested the state board to undertake it, and in such case the county was still obliged to raise the money for that purpose. The act did not, in itself, carry any direct appropriation, but provided that the board might receive any money donated or given it from private sources, from federal, state, county, or municipal governments, or donations from charitable associations. The powers of the board were, to a great extent, advisory in their nature, and

so far as compulsory and effective administration was concerned, it had little actual authority.

In addition to chapter 35, *supra,* the legislature, at the first special session, adopted chapter 17, commonly called the Privilege Sales Tax, and therein included section 21, part of which reads as follows:

"After deducting the expenses of the commission in administering this act the state treasurer shall place fifteen per cent of the tax moneys collected under this article for every calendar month to the credit of the governor's relief fund. Such fund shall in every case be expended by or through such public welfare organizations as may be designated by the governor, or directly by the governor for the purpose of furnishing employment in connection with any state, county or municipal work or improvement, or for relief. The moneys in such fund shall be expended by warrants drawn upon the state treasury by the state auditor, in the amounts requested by the governor, in the manner provided by law, payable in such amounts and to such organizations or through agencies provided for hereunder, as shall be designated by the governor. In the event that any sum shall remain in such fund which the governor shall deem not necessary for the purpose specified hereunder, then such remainder shall be transferred to the general fund by warrants drawn in like manner upon the order of the governor."

This provided a method of general public relief, independent of the board created by chapter 35, *supra,* under the exclusive control of the Governor, the only limitation on his discretion being that it must be used for the relief of unemployment. But this time the federal government had assumed much of the responsibility for such relief, administered mainly through its own agencies.

In 1935 by chapter 77 (art. 2), § 21, the legislature amended the Privilege Sales Tax in several respects, including the following substitute for section 21, *supra,* as follows:

"After deducting the expenses of the commission in administering this act and any warrants drawn against the special privilege tax account as provided for in sections 17 and 26 of this article, the state treasurer shall place fifteen per cent of the tax moneys collected under this article for every calendar month to the credit of the governor's relief fund. Such fund shall in every case be expended by or through such public welfare organizations as may be designated by the governor, or directly by the governor for the purpose of furnishing employment in connection with any state, county or municipal work or improvement, or for relief. The moneys in such fund shall be expended by warrants drawn upon the state treasury by the state auditor, in the amounts requested by the governor, in the manner provided by law, payable in such amounts and to such organizations or through agencies provided for hereunder, as shall be designated by the governor. In the event that any sum shall remain in such fund which the governor shall deem not necessary for the purpose specified hereunder, then such remainder shall be transferred to the general fund by warrants drawn in like manner upon the order of the governor."

It also adopted chapter 78 of the regular session, known as the Luxury Tax Law, which included the following:

Art. IV, Sec. 2. "The commission shall promptly remit all moneys received under the provisions of this act to the state treasurer, through the state auditor, and the treasurer shall place an amount equal to four per cent thereof to a special fund to be known as 'the luxury tax administration fund' and shall place the remainder, or ninety-six per cent of all such moneys, in a fund to be known as the 'state public welfare fund.' . . .

"There is hereby appropriated to the governor's 'relief fund' out of the taxes collected hereunder the sum of five thousand dollars per month to be used by the governor of the state of Arizona for unemployment and relief purposes. The sum remaining after

deducting the expenses of the commission in administering the act, the auditor's appropriation and the appropriation to the governor's relief fund are hereby appropriated to the state board of public welfare to be used for the purpose of relief, relieving unemployment in the state and carrying out the objects set forth in chapter 35, Laws of the Eleventh Legislature, 1933, in regular session.''

There were thus on January 1, 1937, three agencies for the administration of relief in Arizona, overlapping in many particulars, and with their duties more or less in conflict—the counties, the Governor, and the federal government. By 1937 the federal government had worked out a fairly definite system for the extension of direct financial aid to the state in its caring for certain of its indigents. The federal act was of such a nature, however, that it required additional legislation by the state before the latter could profit by the terms of the national law, and the legislature of Arizona, therefore, passed four acts, being chapters 69, 70, 71, and 72 of the regular session of 1937.

This suit was brought to determine the powers of and the duties imposed upon the State Welfare Board created by chapter 69, *supra,* in regard to the relief of the needy in Arizona. The answer to this question will, of course, depend upon the language of the act and the interpretation which is to be given to that language. Before we proceed with a consideration of the matter, we think it best that we restate some of the rules which are used in the interpretation of statutes. The most important ones applicable to the present situation are two in number. The first was set forth by us in the case of *Hicks* v. *Krigbaum,* 13 Ariz. 237, 108 Pac. 482, 484, in the following language quoted approvingly from Bacon's Abridgment:

'' 'Such construction ought to be put upon a statute as may best answer the intention which the makers had in view. . . . The intention . . . is sometimes

to be collected from the cause or necessity of making a statute; at other times, from other circumstances. Whenever this can be discovered, it ought to be followed with reason and discretion in the construction of the statute, although such construction seems contrary to the letter of the statute. . . . A thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter. . . . A thing which is within the letter of a statute is not within the statute, unless it be within the intention of the makers.' [Citing cases.] 'A rigid and literal reading would in many cases defeat the very object of the statute. . . . Every statute ought to be expounded, not according to the letter, but according to the meaning. . . . And the intention is to govern, although such construction may not in all respects agree with the letter of the statute. The reason and object of a statute are a clue to its meaning, and the spirit of the law and the intentions of its makers are diligently to be sought after, and the letter must bend to these.' ''

We had occasion to restate the same rule in different language in the case of *Deyo* v. *Arizona Grading etc. Co.,* 18 Ariz. 149, 157 Pac. 371, 372, L. R. A. 1916E 1257, as follows:

"The first rule of interpretation and construction of statutes is that the intention of the legislature, when determinable, shall control. This rule is very well stated in the following cases:

" 'In the interpretation of statutes, the great principle which is to control is the intention of the Legislature in passing the same, which intention is to be ascertained from the cause or necessity of making the statute as well as other circumstances. A strict and literal interpretation is not always to be adhered to, and where the case is brought within the intention of the makers of the statute, it is within the statute, although by a technical interpretation it is not within its letter. It is the spirit (the object) and purpose of a statute which are to be regarded in its interpretation, and if they find fair expression in the statute, it should be

so construed as to carry out the legislative intent, even though such construction is contrary to the literal meaning of some provisions of the statute.' *People* v. *Lacombe,* 99 N. Y. 43, 1 N. E. 599.

" 'In the construction of statutes, it is a cardinal rule that the intention of the Legislature must govern. Suth. St. Const. par. 218; Sedg. St. & Const. Law, p. 325.. Also, that when the intention can be gathered from the statute, words may be modified, altered or supplied to give to the enactment the force and effect which the Legislature intended.' *Territory* v. *Clark,* 2 Okl. 82, 35 Pac. 882.

" 'Statutes must have a rational interpretation, to be collected not only from the words used, but from the policy which may be reasonably supposed to have dictated the enactment.' *Anderson Driving Park Assn.* v. *Thompson,* 18 Ind. App. 458, 48 N. E. 259.''

And we gave one of the rules for determining that intent in the case of *Coggins* v. *Ely et al.,* 23 Ariz. 155, 202 Pac. 391, 394, as follows:

"For the purpose of arriving at the intention, resort may be had to the words, the context, the subject-matter, the effects and consequences, the spirit and reason of the law, and other acts *in pari materia.* Sutherland, Statutory Construction (Lewis' 2d Ed.) § 586. . . .

"It is also elementary that we may determine the legislative intent from necessary implication as to what was intended. What is necessarily implied in a statute is as much a part of it as what is expressed. Speaking of this subject of necessary implication, the court, in the case of *Gilbert* v. *Craddock* [67 Kan. 346, 72 Pac. 869], *supra,* says:

" 'It (the implication) may be drawn from public policy; past acts; the entire terms, purposes, and scope of the act to be considered; the inconvenience, inconsistencies, and the absurdities involved in the contrary consideration; indeed, from all of the things found in the act, the conditions surrounding it, the history antedating it, the purposes to be accomplished by it, and the policy dictating it. . . . On the same subject, it is said in Sutherland on Statutory Construc-

tion, § 336; '' . . . A necessary implication means not natural necessity, but so strong a probability of an intention that one contrary to that which is imputed to the party using the language cannot be supposed.'' ' ''

The other rule was laid down in *Higgins' Estate* v. *Hubbs,* 31 Ariz. 252, 252 Pac. 515, 519. A strong argument was based upon the grammatical construction and the literal phraseology of the statute, and we said:

''The old doctrine of *'lex ita scripta est'* has often been invoked ever since, and probably before, the leading case of *Shylock* v. *Antonio,* and the famous plea of 'it is not so nominated in the bond' has been repeatedly urged. Many, indeed, of our courts have listened to that specious appeal, and have followed the rule, and others in their efforts to avoid monstrous injustice have been driven, even as was the judge in that case, to technicalities of interpretation as fine spun as those used by Portia. We think, however, in this modern day and generation we have grown beyond such pleas and such expedients for avoiding them. We have often held in the past, and we again repeat, that in the interpretation of any statute the intent of the Legislature is the real test of the meaning of the law, and that strict rules of technical grammar will not be resorted to to defeat its plain purpose.''

With these two principles established, let us examine the act. The first thing which we consider is the title, which reads as follows:

''An Act providing for the creation of the Arizona Board of Social Security and Public Welfare; fixing the powers and duties of the board; providing for its administration of the act for assistance to the needy blind of 1937, the act for assistance to dependent children of 1937, the act for old age assistance of 1937, and transferring to the state Board the powers and functions of the Arizona State Board of Public Welfare and repealing chapter 35, Session Laws of 1935, and all acts or parts of acts in conflict therewith; and declaring an emergency.''

It will be seen that, among other things in the title, there is an express repeal of ''chapter 35 of the session laws of 1935'' and all the acts or parts of acts in conflict ''therewith.'' Upon examining the chapter referred to in the title as being repealed, we find that it is a law appropriating seventy-five hundred dollars for the purpose of paying the salary of the personal representative of the Governor in the national capital, commonly known as the ''Ambassador's Act.'' It seems to us very doubtful that the legislature would consider it necessary to repeal an act of this nature in a bill providing for the creation of a Social Security and Public Welfare Board. This is confirmed by the fact that section 16 of the act, which is the repealing clause, refers to chapter 35 of the Session Laws of 1933 instead of 1935, as being repealed, and we find that chapter is the bill creating a State Board of Public Welfare, one which would naturally be repealed by chapter 69, *supra,* creating a board to take over the functions of the board established by the act of 1933. It is evident to us that the title of the act contains a clerical error, in that the legislature meant to refer to chapter 35 of the Session Laws of 1933 instead of 1935. The same principle applies to the word ''therewith'' found in the title of the act. It is contended that the only thing repealed, in addition to chapter 35 of the Session Laws of 1935 is all acts and parts of acts in conflict with such act, and not those in conflict with chapter 69. We again refer to section 16 of the chapter and find that the word used therein is ''herewith'' instead of ''therewith.'' We are equally satisfied that the word ''therewith'' in the title is also a clerical error, and that the legislature meant to say ''herewith.'' In other words, section 16, the repealing clause of the act, sets forth the true intent of what the legislature meant to repeal, and the differences in the title are mere clerical errors. Under the rule laid

down in *Higgins' Estate* v. *Hubbs, supra,* we hold that chapter 69, *supra,* repeals chapter 35 of the Session Laws of 1933, and all acts or parts of acts in conflict with chapter 69.

▉ Let us then consider just what is enacted by chapter 69, and what is necessarily repealed thereby. Section 7 refers to the activities of the department, and reads as follows:

"The State Department shall be charged with the administration of all the welfare activities of the state as hereinafter provided. The State Department shall:

"(a) Administer all forms of public assistance including general home relief, outdoor and indoor care and medical care for persons in need, old age assistance, aid to dependent children, aid to the blind, service to crippled children; and shall administer all institutions now administered by the State Board of Public Welfare; supervise agencies and institutions caring for dependent or mentally or physically handicapped or aged adults; approve the incorporation of charitable agencies; and administer such other welfare activities or services as may be vested in it; provided, however, that nothing in this section shall be construed to mean the state institutions operated by the Board of Directors of State Institutions;

"(b) Administer all child welfare activities, including importation of children; licensing and supervising of private and local public child-caring agencies and institutions; the care of dependent, neglected and delinquent children in foster family homes, or in institutions, especially children placed for adoption;

"(c) Establish and administer a program of service for children who are crippled or who are suffering from conditions which lead to crippling, which shall provide for developing, extending, and improving services for locating such children, and for providing for medical, surgical, corrective, and other services and care, and facilities for diagnosis, hospitalization, and aftercare; supervise the administration of those services included in the program which are not administered directly by it; extend and improve any such

services, including those in existence on the effective date of this Act; cooperate with medical, health, nursing and welfare groups and organizations, and with any agency of the state charged with the administration of laws providing for vocational rehabilitation of physically handicapped children; to cooperate with the federal government, through its appropriate agency or instrumentality in developing, extending, and improving such services; and receive and expend all funds made available to the department by the federal government, for services to crippled children, the state or its political subdivisions, or from other sources, for such purposes;

"(d) Develop such agencies as it may deem necessary for providing services to the blind including the prevention of blindness, the location of blind persons, medical service for eye conditions, vocational guidance and training of the blind, placement of blind persons in employment, instruction of the adult blind in their homes, and other social services for blind persons; or cooperate with such similar agencies already established;

"(e) Assist other departments, agencies and institutions of the state and federal governments, when so requested, by performing services in conformity with the purposes of this Act;

"(f) Act as the agent of the federal government in the furtherance of any functions of the State Department;

"(g) Carry on research and compile statistics relative to the entire public welfare program throughout the state, including all phases of dependency, defectiveness, cooperate with the superior courts in cases of delinquency and related problems; and develop plans in cooperation with other public and private agencies for the prevention as well as treatment of conditions giving rise to public welfare and social security problems; to make the necessary expenditures in connection therewith;

"(h) Make such rules and regulations, and take such action deemed necessary or desirable to carry out the provisions of this Act, and which are not inconsistent therewith;''

We think there can be no question on reading this section that the legislature intended to create a board which should have the entire charge of the administration of all the welfare activities of the state and of all forms of public assistance given under or by virtue of any statute, with the exception of the institutions now operated by the board of directors of state institutions, and that all provisions for the administration of welfare activities and public assistance of any nature by any other person, board, or political subdivision of the state are necessarily repealed thereby. In the case of *Olson* v. *State,* 36 Ariz. 294, 285 Pac. 282, 284, we said:

"The Highway Act itself discloses in the very first clause of its title that in passing it the legislature was prompted by a desire to provide a full and complete Highway Code. It reads: 'An Act to provide a code for the systematic and orderly administration of all matters and affairs directly affecting or concerning the highways of the State.' One hundred thirty-five pages of the volume containing it are devoted to it, and the various phases of the subject—new ones as well as all those dealt with in the statute of 1913 and its amendments—are treated in it so comprehensively and thoroughly that it is inconceivable that the legislature intended to retain any portion of the old law. 'Where the later of two acts,' to use the language of *District of Columbia* v. *Hutton,* 143 U. S. 18, 12 Sup. Ct. 369, 36 L. Ed. 60, 'covers the whole subject-matter of the earlier one, not purporting to amend it, and plainly shows that it was intended to be a substitute for the earlier act, such later act will operate as a repeal of the earlier one, though the two are not repugnant.' *Grant* v. *Baltimore & O. R. Co.,* 66 W. Va. 175, 66 S. E. 709, 710; *Cunningham* v. *Cokely,* 79 W. Va. 60, 90 S. E. 546, L. R. A. 1917B 718; 25 R. C. L. 913.

"It being true, therefore, that the last expression of the legislature on any subject is the law whether the old statute be consistent therewith or not, the only way by which provisions of the old not inconsistent with those of the new dealing with the same

subject matter may be continued is by express language to that effect, and when this does not appear a repeal by implication is the result. Such is the purport of par. 5553, Revised Statutes of 1913, reading as follows:

" 'When a statute has been enacted by the legislative power of the state, and has become a law, no other statute, law or rule, is continued in force because it is consistent with the provisions of such statute, passed subsequently thereto, but in all cases provided for by such subsequent statute, all statutes, laws and rules, theretofore in force in this state, whether consistent or not with the provisions of such subsequent statutes, unless expressly continued in force by it, shall be repealed and abrogated.' "

We think the principle laid down in the Olson case in regard to the Highway Code is fully applicable to chapter 69, *supra*. We hold, therefore, that chapter 69 necessarily by implication repeals all legislation authorizing either the boards of supervisors of the counties, or the Governor, to expend any money for public assistance to the needy of any class or in any manner, and gives the authority on that subject previously exercised by those agencies exclusively to the new board created by chapter 69, *supra*.

But, it is urged by appellant, the legislature surely could not have meant this for it has failed to provide any funds whereby the board may carry on its duties, and it cannot be conceived that the legislature meant to take from the counties and the Governor the power to give the vitally necessary relief without providing some method whereby it may be given. We think that the legislature has made ample provision for such relief. Section 12 of chapter 69 reads as follows:

*"Power; Administration of State Funds.* (a) The State Board shall have the power to institute or approve work projects in any county for the employ-

ment of dependent unemployed receiving relief therefor;

"(b) The State Board shall act as the official agency for the state in any social welfare activity initiated by the federal government and to administer any state funds that may at any time be appropriated or made available for the relief of dependent persons."

If, then, the legislature has at any time appropriated or made available funds for the relief of dependent persons, by the precise language of section 12, *supra,* these funds are transferred to the control of the state board to be used by it for such purposes. Let us examine the statutes to see if any such funds may be found therein.

Chapter 78, *supra,* specifically appropriated all except a small portion of the luxury tax to the old State Board of Welfare created by chapter 35, *supra.* By the express terms of section 13 of chapter 69 the unexpended balance of any appropriation made for that board is made available for the new board of social security. And since the appropriation in chapter 78 for the old board is a continuing one, we think it also continues for the new one.

██ There remains for consideration the 15 per cent. of the privilege sales tax and the $5,000 per month from the luxury tax originally set aside to be administered by the Governor for relief purposes. Since the administration of relief of every nature is now vested in the Social Security Board, no portion of the Governor's relief fund can now be used under his authority or direction. That fund must, therefore, either revert to the general fund, as all moneys left in any special fund do after the authority to expend them ceases, or else pass to the new agency created to carry on the work. In view of the provisions of section 12 of the act, and the continuing necessity of the relief for which the Governor's relief fund was

created, we think the latter course represents the intent of the legislature.

We hold, therefore, (a) that chapter 69, *supra,* has transferred to the State Department of Social Security and Public Welfare the administration of all forms of public assistance, and that none of the other officials or political subdivisions of the state has any right to use public funds for such purposes; (b) that in order to carry out the provisions of the act there was transferred to the administration and control of the state board all state funds that had previously been appropriated or made available for the relief of dependent persons, including therein the 15 per cent. of the revenue of the Privilege Sales Act of 1935 appropriated and made available for the relief of dependent persons under the direction of the Governor; the $5,000 per month appropriated for unemployment and relief purposes by the luxury tax of 1935, to be used under the direction of the Governor, and that portion of the luxury tax appropriated for the State Board of Welfare, subject only to such other specific disposition of these funds as may have been made by the legislature.

The judgment of the superior court of Maricopa county is affirmed.

McALISTER, C. J., and ROSS and LOCKWOOD, JJ., concur.