[Civil No. 3896.   Filed July 12, 1937.]

[70 Pac. (2d) 327.]

STATE OF ARIZONA ex Rel. ANA FROHMILLER, State Auditor, Petitioner, v. HARRY M. MOORE, State Treasurer, Respondent; STATE BOARD OF SOCIAL SECURITY AND WELFARE, Intervener.

Mrs. Ana Frohmiller, Petitioner, *in pro. per.*, and Mr. P. H. Brooks, Deputy State Auditor, for Petitioner.

Mr. Joe Conway, Attorney General, Mr. J. M. Johnson and Mr. W. E. Polley, his Assistants, for Respondent and Intervener.

ROSS, J.—The State Auditor and the State Treasurer not being able to agree on the law for the disposition of the sum of $53,083.46 now in the state treasury, the former has petitioned this court asking that the treasurer be required to place said sum in the state's general fund and the latter has answered

that such sum belongs to the State Board of Social Security and Welfare. The latter agency has petitioned the court for leave to intervene and the petition being granted has filed a pleading in which it adopts the theory of the State Treasurer.

The history of the fund in question is as follows: In 1933 the first broad and somewhat inclusive social service legislation was enacted by our legislature. See chapter 35, Laws of 1933. This law created a State Board of Public Welfare and clothed it with the power and duty to look after and supply the needs of those of our citizens unable to take care of themselves and, among other things, to initiate or approve work projects for relief and

"To act as the official agency for the state in any social welfare activity initiated by the federal government and to administer any state funds that may at any time be appropriated or made available for the relief of destitute or necessitous persons." Subdivision 13, § 3.

During 1935 the said state board had a large number of employees—in supervisory, executive, and clerical positions, in the building and other trades, mechanics, and many other skilled and unskilled workers —all employed in aid of the needy and unemployed persons or on public works projects carried on under the authority of said chapter 35. All of these employees were insured in the State Compensation Fund, the premiums being paid by the State Board of Public Welfare. For the purpose of fixing insurance rates and collecting premiums, the Industrial Commission placed the State Board of Public Welfare with its employees in what it designated as "Class 0022, Civics," which class contained other state departments and private concerns which pay insurance on their employees. Such classification is in accordance with

the provisions of section 1413, Revised Code of 1928, which makes it the duty of the Industrial Commission to give credit to or declare cash dividends to each member in a classification when the assets therein exceed the liabilities. The premiums for the year 1935 were $135,300.51 which it turned out was far in excess of the liabilities in "Class 0022, Civics," and the Industrial Commission accordingly declared cash dividends to the insurers in such class, the State Board of Public Welfare's dividend being $53,083.46. This sum the Industrial Commission, on March 30, 1937, paid to the State Board of Public Welfare by check, which was deposited with the State Treasurer, who, in turn, placed it to the credit of the State Public Welfare Fund.

Chapter 35, Laws of 1933, was repealed by chapter 69, Laws of 1937, the latter setting up an entirely new plan of social security and public welfare and placing its administration in the hands of the State Board of Social Security and Welfare, successor to the former board and intervener herein. See *Mahoney et al.* v. *Maricopa County*, 49 Ariz. 479, 68 Pac. (2d) 694.

■■ In 1935 the State Board of Public Welfare had no funds with which to insure its employees. The legislature, by section 2, article 4, chapter 78, Laws of that year, appropriated to such board for "unemployment and welfare relief" 96 per cent. of the taxes collected under said chapter (known as the luxury tax law) and directed the State Tax Commission, the collector of such tax, to place the same in a fund to be known as the "State Public Welfare Fund," and that was the only state source from which the State Board of Public Welfare obtained its funds. These funds could not legally be used for anything except objects falling within the terms "unemployment and welfare relief," as used in chapter 78, *supra.* Certainly not to pay premiums on insurance of employees of the

state board. Whatever money the state board used for insurance was therefore diverted from the use intended by the legislature to another and different use, and the fund for ''unemployment and relief'' was depleted to the extent of the $135,300.51. The law then and now was and is that insurable state employees should be insured in the State Compensation Fund. Sections 1418, 1419, and 1425, Revised Code of 1928. Section 1425, *supra,* makes it the duty of the State Auditor to furnish the Industrial Commission quarterly pay-rolls of the state's insurable employees and to draw his warrant for premiums due in favor of the State Treasurer on the appropriation made therefor in the general appropriation bill for the State Compensation Fund. The appropriation for 1935 for that purpose was only $20,000. Subdivision 35, chapter 107 (general appropriation bill).

The Industrial Commission thus was put on notice as to who should draw warrants for premiums on insurance for employees of the state and the fund against which such warrants should be drawn. The Industrial Commission knew when it accepted premiums from the State Board of Public Welfare that warrants for such premiums should be drawn by the State Auditor and paid by the State Treasurer out of appropriations specifically made for that purpose by the legislature.

It is apparent that the State Board of Public Welfare had no right under the law to pay the premiums as it did, and also that the Industrial Commission had no right to accept from the state board such premiums. If after the transaction, and before the Industrial Commission had expended or encumbered the premiums in awards to the employees insured or their dependents, the Industrial Commission had returned the premiums to the State Board of Public Welfare, its right thus to re-establish the *status quo ante* would not be seriously questioned. Or if at any later time

the Industrial Commission should have returned the premiums unexpended and unencumbered to the State Board of Public Welfare, because it had no right to receive them, it might have done so. In other words, it would have been giving back to the State Board of Public Welfare something that belonged to it and which it had no right to surrender in the payment of premiums.

The Industrial Commission has voluntarily returned to the State Board of Public Welfare that portion of the premiums not paid out in awards or not encumbered, and although it is called a cash dividend we think it should and may properly be treated as repayment or replenishment in part of the appropriation made to the state board for unemployment and relief.

If this be the correct law, and we see no legal reason why it is not, the sum in controversy is in law an unexpended balance to the credit of the State Board of Public Welfare. The fact that it was misapplied temporarily and thereafter returned in part to the agency authorized and directed to use it, should not convert the returned amount to a purpose never intended. So we conclude that the $53,083.46 in question is properly placed to the credit of the State Board of Public Welfare, unless chapter 69, Laws of 1937, has made a different disposition of it. Section 13 of said chapter 69 reads:

"Section 13. *Transfer of Records.* Upon this Act becoming effective, all records, files, property, including office equipment of the State Board of Public Welfare and county boards of public welfare shall be transferred to and vested in the State Board and the unexpended balance of any appropriation made for the said board is hereby made available to the State Board (of Social Security and Welfare) herein created for the purpose of carrying out the duties and performing the obligations of said board."

It is quite clear to us that the sum in question is an unexpended balance of an appropriation made for the State Board of Public Welfare, and, being so, under this section is available to its successor, the State Board of Social Security and Welfare for the purpose of carrying out the duties and performing the obligations of said board. See *Mahoney et al.* v. *Maricopa County, supra.*

It follows that the writ heretofore issued should be quashed, and it is so ordered.

The intervener seeks to very much enlarge the issues as made by the pleadings of petitioner and respondent by alleging that the State Board of Public Welfare paid, out of its appropriation for relief and unemployment, for premiums on its employees, to the Industrial Commission: For the year 1933, $30,094.65; for the year 1934, $113,524.38; for the year 1935, $135,300.51; for the year 1936, $5,036.96; and for the year 1937, to and including the month of May, $1,888.78, making a grand total of $285,845.28. After crediting this total with the sum of $53,083.46, the intervener prays that the court order the State Auditor to issue her warrant or certificate of indebtedness on the state in the sum of $232,761.82, payable to the State Board of Social Security and Welfare, out of the General Fund of the state.

The facts are so inadequately and insufficiently set out in the pleadings we have before us that we feel we should not undertake to decide the question propounded by the intervener.

It is a well-known fact that the State Board of Public Welfare co-operated during the years 1933, 1934, 1935, and to the present time with the federal government in all of its relief and works project measures and that more money was furnished by the federal government than by the state to maintain these operations in looking out for the needy and providing

labor for those without employment. It can easily be seen that the questions raised by the intervener cannot be properly disposed of in the absence of the Industrial Commission, which is not a party. Nor can we say what disposition should be made of the question without a full presentation of the facts and the law.

McALISTER, C. J., and LOCKWOOD, J., concur.